1  WAYNE R. BERRY, DC Bar 429661
   PETER D. DOLAN, IL Bar 0065 0285
2  W. IRIS BARBER, DC Bar 436398
3  MEGAN GUENTHER, MD Bar (number not used)
   Trial Attorneys
4  Office of the Solicitor
   United States Department of Labor
5  200 Constitution Avenue, N.W., Room N-4611
6  Washington, DC  20210
   Telephone: (202) 693-5600, Facsimile:  (202) 693-5610
7  berry.wayne@dol.gov; dolan.peter@dol.gov
   barber.iris@dol.gov; guenther.megan@dol.gov
8
9  Attorneys for Plaintiff ELAINE L. CHAO
   Secretary of Labor, United States Department of Labor
10

11            UNITED STATES DISTRICT COURT

12          NORTHERN DISTRICT OF CALIFORNIA

13
14  ELAINE L. CHAO, Secretary of Labor,        )  Civil Case No. C 04-4949 PJH (EMC)
    United States Department of Labor,         )
15                                             )  DECLARATION OF KARL
                            Plaintiff,         )  SPARGUR IN SUPPORT OF
16                                             )  SECRETARY'S MOTION FOR
                       v.                      )  PARTIAL SUMMARY JUDGMENT
17                                             )
18  LAWRENCE J. MAZZOLA, et al.,               )  Date:    March 7, 2007
                                               )  Time:    9:00 a.m.
19                          Defendants.        )  Court:   Courtroom 3, 17th Floor
                                               )  Judge:   Hon. Phyllis J. Hamilton
20  _____

21
22       I, KARL SPARGUR, hereby declare and state as follows:

23       1.      I am a senior investigator for the San Francisco Regional Office of the

24  Employee Benefits Security Administration ("EBSA") of the United States Department of

25  Labor.  I have personal knowledge of the facts stated herein as facts that I discovered

26  during the course of my investigation and, if necessary, I could and would testify to them.

27  I also have reviewed the EBSA official file regarding this investigation and am familiar

28  with the documents contained therein, which were made or gathered in the ordinary course

1  of official government business by me or other EBSA staff members.  I was also the

2  Secretary's Federal Rule of Civil Procedure 30(b)(6) Designee for Defendants' Sixth

3  Amended Notice of 30(b)(6) Oral Deposition witness to testify regarding the following

4  areas: paragraphs 1 – 8 and 12 – 14 for EBSA investigations opened on or after 1987; and,

5  paragraphs 9 – 11, and can competently testify as to those matters. [A true and correct

6  copy of the Defendants' Sixth Amended Notice of 30(b)(6) Oral Deposition is attached

7  hereto as Exh. 2; and, a true and correct copy of the excerpt from the Deposition of

8  30(b)(6) Designee Karl Spargur taken on October 11, 2006 is attached hereto as Exh. 3,

9  pp. 9 – 10.]

10       2.       Pursuant to section 504 of the Employee Retirement Income Security Act

11  of 1974 ("ERISA"), 29 U.S.C. § 1134(a), and at the direction of the Secretary of Labor,

12  EBSA has the authority to investigate whether any person has violated or is about to

13  violate any provision of Title I of ERISA or any regulation or order thereunder.

14       3.       In the course of my employment with EBSA, I began an investigation of

15  the U.A. Local 38 Pension Trust Fund ("Pension Plan").

16       4.       On February 23, 2000, based on a referral from the Internal Revenue

17  Service on November 4, 1999. I opened my investigation of the Pension Plan.

18       5.       On July 22 and October 1 of 2003, EBSA expanded our investigation of the

19  Pension Plan to include the U.A. Local 38 401(a) Pension Trust, U.A. Local 38

20  Apprentice & Journeyman Training Trust ("Apprenticeship Fund"), U.A. Local 38 Health

21  & Welfare Fund ("Health & Welfare Plan"), U.A. Local 38 Vacation & Holiday Trust

22  ("Vacation & Holiday Fund"), U.A. Local 38 Scholarship Trust Fund ("Scholarship

23  Fund"), and U.A. Local 38 Group Supplemental Unemployment Benefit Trust

24  (collectively referred to as the "Local 38 ERISA Plans"), and Frank Sullivan, as the in-

25  house administrator of the Local 38 ERISA Plans and the non-ERISA U.A. Local 38

26  Convalescent Trust Fund  ("Convalescent Fund").  In connection with those

27  investigations, I also reviewed numerous documents of the Convalescent Fund, which is

28  not covered by ERISA; and, Local Union 38 of the United Association of Journeyman and

1  Apprentices of the Plumbing and Pipefitting Industry ("Local 38"), also not an ERISA

2  plan. [A true and correct copy of the EMS Case Opening materials are attached hereto as

3  Exh. 4.]

4       6.       My investigation involved obtaining documents from Local 38 and its

5  General Counsel, Albert Brundage ("Mr. Brundage"); the Joint Board of Trustees of the

6  Local 38 Funds ("Joint Board"); Frank Sullivan ("Mr. Sullivan"); M. Maroni Smith ("Mr.

7  Smith"), who was then the Convalescent Fund's Independent Trustee and is now deceased;

8  and various service providers, including Comyns, Smith, McCleary, auditor of the Local

9  

10  38 ERISA Plans and the Convalescent Fund; Health Services Benefit Administrators, Inc.

11  ("HSBA"), third party administrator for the Local 38 ERISA Plans; and, McMorgan & Co.

12  and Loomis, Sayles & Company, L.P., investment managers employed by the Pension

13  Plan.

14  

15       7.       EBSA entered into agreements with the Joint Board tolling the statute of

16  limitations as of September 18, 2001. [True and correct copies of the executed tolling

17  agreements effective September 18, 2001 are attached hereto as Exh. 5, MZLA 0031238-

18  243 and MZLA 0031445.]  EBSA entered into an agreement with Mr. Sullivan tolling the

19  statute of limitations as of October 21, 2002.  [A true and correct copy of the executed

20  

21  tolling agreement with Mr. Sullivan is attached hereto as Exh. 6, X 000 575-578.]  On

22  October 25, 2002, EBSA entered into an extension of the September 18, 2001 tolling

23  agreements with the Joint Board.  [A true and correct copy of the October 2002 executed

24  tolling agreement with the Joint Board is attached hereto as Exh. 7, X 000 586-590.]  On

25  

26  November 26, 2003, EBSA consolidated the separate tolling agreements with the Joint

27  Board and Mr. Sullivan into a single extension agreement, which also included Mr. Smith.

28  Under the November 26, 2003 agreement, the parties agreed that the statute of limitations

was tolled for all parties as of September 18, 2001, and would remain tolled until 60 days after notice of termination.  The November 26, 2003 tolling agreement also provided that the Trustee Defendants would not make any further transfers of ERISA funds to the Convalescent Trust.  [A true and correct copy of the executed tolling agreement effective September 18, 2001 is attached hereto as Exh. 8, MZLA 0028949-956.]

8.      As of September 18, 2001, I had begun collecting and reviewing documents and had served subpoenas for documents, dated August 29, 2001, to the Administration Office ("Administration") and the Pension Plan's service providers.  I had not yet developed the facts sufficiently to establish whether any potential ERISA violations had yet occurred.

## II.  SUMMARY OF INVESTIGATIVE FINDINGS

9.      Through my review of documents, taking interviews, and attending or reviewing the transcripts of the administrative depositions[1] of individuals with responsibility over the Local 38 ERISA Plans, my investigation revealed that from approximately the plan years ending June 30th 1993 to 2003, the Local 38 Pension Plan was transferring large amounts of cash from its checking account.  During those years, the Pension Plan's financial statements reported a growing "Receivable Due from Administration."  As of June 30, 2003, with accrued interest, the Pension Plan's "Receivable Due from Administration" totaled over $54.5 million, or over 37% of the Pension Plan's net assets.  [A true and correct copy of the Pension Plan's Annual Report

---

[1] In September 2003 the Department deposed former Plan Administrator Frank Sullivan and current and former Joint Board Trustees: Arthur Rud, Lawrence Mazzola, Sr., Larry Mazzola, Jr., Ron Fahy, William B. Fazande, Vohon J. Kazarian, James R. Shugrue, Robert Buckley, Sr., Robert Buckley, Jr. and Robert Nurisso.

1   Form 5500 and financial statement for the plan year ending June 30, 2003, is attached

2   hereto as Exh. 9, MZLA 0084487, MZLA 0084513 and MZLA 0084535.]

3       10.     Specifically with respect to the Pension Plan's "Receivable Due from

4   Administration", through document reviews covering documents from July 1995 to June

5

6   2003, interviews and administrative depositions, my investigation revealed that, with the

7   exception of Lawrence "Larry" J. Mazzola, Sr., ("Mr. Mazzola") the Joint Board were

8   unaware of the cash transfers or the growing "Receivable Due from Administration."

9   Further, Mr. Mazzola was aware that Pension Plan money was being transferred to the

10  Convalescent Fund, but did not take steps to evaluate whether the cash transfers

11  represented a sound investment for the Pension Plan.  For example, for the years in

12

13  question, I saw:

14          a.  No mention of the cash transfers in any of the trustees' meeting minutes;

15          b.  No cost-benefit analyses;

16

17          c.  No risk/return analyses;

18          d.  No feasibility reports or studies;

19          e.  To the extent I saw appraisals, they were few, out of date and did not

20              support the amount of the "Receivable Due from Administration" reported

21              on the Plan's Annual Reports Form 5500 and attached financial statements.

22

23              During my investigation, the highest appraisal I saw for the Konocti Harbor

24              Resort and Spa ("Konocti") was dated July 2003 for $9.1 million.  [A true

25              and correct copy of the Appraisal Of: Konocti Harbor Resort & Spa dated

26              July 2003 by Carneghi-Bautovich & Partners, Inc. is attached hereto as

27              Exh. 10 MZLA 0106491, MZLA 0106492.]

28

11.     In addition, through the interviews and administrative depositions that were taken during my investigation, I learned that most of the trustees had never looked at any of the Pension Plan's Annual Forms 5500 and attached financial statements. [A true and correct copy of the excerpt from the Administrative Deposition of Arthur Rud, taken September 4, 2003, is attached hereto as Exh. 11, MZLA 0001302 and MZLA 0001305 – MZLA 0001307; a true and correct copy of the excerpt from the Administrative Deposition of Larry Mazzola, Jr., taken September 5, 2003, is attached hereto as Exh. 12, MZLA 0001006; a true and correct copy of the excerpt from the Administrative Deposition of Ron Fahy, taken September 4, 2003, is attached hereto as Exh. 13, MZLA 0000818; a true and correct copy of the excerpt from the Administrative Deposition of William Fazande taken September 5, 2003, is attached hereto as Exh. 14, MZLA 000862; a true and correct copy of the excerpt from the Administrative Deposition of Vohon Kazarian taken September 5, 2003, is attached hereto as Exh. 15, MZLA 0000921 – MZLA 0000923, and MZLA 0000946 – MZLA 0000947; a true and correct copy of the excerpt from the Administrative Deposition of James Shugrue, taken September 5, 2003, is attached hereto as Exh. 16, MZLA 0001385 – MZLA 0001387; a true and correct copy of the excerpt from the Administrative Deposition of Robert Buckley, Sr., taken September 5, 2003, is attached hereto as Exh. 17, MZLA 0000743 – MZLA 0000747; a true and correct copy of the excerpt from the Administrative Deposition of Robert Buckley, Jr., taken September 4, 2003, is attached hereto as Exh. 18, MZLA 0000633; a true and correct copy of the excerpt from the Administrative Deposition of Robert Thomas Nurisso, taken September 3, 2003, is attached hereto as Exh. 19, MZLA 0001227 – MZLA 0001228]

12.     During an interview Mr. Sullivan informed me that the Convalescent Fund does not make repayments to the Pension Plan.  [A true and correct copy of the Report of Interview of Frank Sullivan taken July 2, 2001 is attached hereto as Exh. 20 ¶ 11, MZLA 0031068.]  My investigation uncovered the fact that the Pension Plan's "Receivable Due from Administration" has increased substantially year by year.

13.     The facts stated in this summary are fully explained below.

**III.  BACKGROUND**

14.     Local 38 is a labor union with members primarily in northern California and is signatory to various collective bargaining agreements ("CBAs") with employers and employer organizations, including the Northern California Mechanical Contractors Association and the Master Plumbers Associations of San Francisco, Inc.  Pursuant to their collective bargaining agreements, trustors representing the union and employers established the Local 38 ERISA Plans.  The same trustors also established the Convalescent Fund, which is not covered by ERISA. [A true and correct copy of the CBA is attached hereto as Exh. 21, MZLA 0011301.]

15.     The Local 38 ERISA Plans are trusteed by the Joint Board.  According to section 47 of the CBA, the Joint Board must consist of six labor and six management representatives appointed by the union and the employer associations.  However, since at least 1998 the Joint Board has had only five management trustees, and from June 2003 until December 2003, as few as four. [A true and correct copy of the CBA is attached hereto as Exh. 21, MZLA 0011301, MZLA 0011328; a true and correct copy of the Pension Plan's Annual Report Form 5500 for the plan year ending June 30, 1998 is attached hereto as Exh. 22, MZLA 0009665, 0009675 – MZLA 0009676; a true and

1   correct copy of the Joint Board's Pension Plan Minutes taken July 22, 2003 is attached

2   hereto as Exh. 23, MZLA 0002605; a true and correct copy of the Joint Board's Pension

3
    Plan Minutes taken January 22, 2004 is attached here as Exh. 24, MZLA 0002617.]  As of
4
5   July 22, 2003 the management trustees were Robert E. Buckley ("Mr. Buckley"), Robert

6   Buckley, Jr. ("Mr. Buckley, Jr."), Art Rud ("Mr. Rud"), and Ron Fahy; and, the union

7   trustees were Mr. Mazzola, Lawrence Mazzola, Jr., William B. Fazande, Larry Lee,

8   Vohon J. Kazarian ("Mr. Kazarian"), and James R. Shugrue (collectively referred to as
9
    "Trustees").  [A true and correct copy of the Joint Board's Pension Plan Minutes dated
10
11  July 22, 2003 is attached hereto as Exh. 23, MZLA 0002605.]

12  **Prior Investigations and Mazzola I Litigation**

13          16.     Before my investigation in February 2000, EBSA (formerly the Pension

14  and Welfare Benefits Administration) had conducted several investigations of Pension

15  Plan, the Health & Welfare Plan and the Convalescent Fund.
16
17          17.     Before my February 2000 investigation, the only EBSA investigation

18  concerning the Pension Plan's transfer of assets to the Convalescent Fund was the 1976

19  investigation of the imprudent loans that culminated in the Secretary suing the trustees for

20  making imprudent and prohibited loans.  Subsequent investigations of the Pension Plan
21
    and Convalescent Fund found that these loans were current and that the Pension Plan did
22
23  not extend any additional loans to the Convalescent Fund.

24          18.     The Secretary's lawsuit stemming from the 1976 investigation charged the

25  Pension Plan trustees with imprudence in making a loan to the Convalescent Fund and

26  agreeing to an interest moratorium on two prior loans.  [A true and correct copy of the
27
28  excerpted Civil Case No. 79-134 Joint Pretrial Statement is attached hereto as Exh. 25,

1  MZLA 0118784 – MZLA 0118785.] The loans were documented by promissory notes,

2  loan agreements and a deed of trust. The Convalescent Fund used the loan money to

3  operate Konocti. At the time of the 1976 investigation, Konocti had never been profitable.

4
5  [A true and correct copy of the excerpted Civil Case No. 79-134 Joint Pretrial Statement is

6  attached hereto as Exh. 25, MZLA 0118808.]

7        19.    The issues in the lawsuit went to trial. The court's findings and judgment

8  are reported in <u>Donovan v. Mazzola</u>, 2 Empl. Ben. Cas. (BNA) 2115 (N.D.Cal. 1981),

9
10 <u>judgment entered</u>, 3 Empl. Ben. Cas. 1737 (N.D. Cal. 1982), <u>aff'd</u>, 716 F.2d 1226, 4 Empl.

11 Ben. Cas. (BNA) 1865 (9th Cir. 1983), <u>cert. denied</u>, 464 U.S. 1040, 4 Empl. Ben. Cas.

12 (BNA) 2544 (1984) ("Mazzola I").

13       20.    The complaint in Mazzola I named several trustees who are also named in

14 the current complaint: Chairman and employer trustee Mr. Buckley; Co-Chairman and

15 union trustee Mr. Mazzola; and, union trustee Mr. Kazarian. [A true and correct copy of

16
17 the excerpted Civil Case No. 79-134 Joint Pretrial Statement is attached hereto as Exh. 25,

18 MZLA 0118782.] The court found, *inter alia*, that the trustees were imprudent for making

19 the loans, acted on both sides of these transactions, and consistently transacted business

20 with the Convalescent Fund for the purpose of aiding it at the expense of the Pension Plan.

21
22 The judgment ordered the trustees to make restitution of lost interest income and post a $1

23 million bond, and provided for a court-appointed investment manager with exclusive

24 power to manage, acquire and dispose of the Pension Plan's assets for ten years.

25       21.    The court-appointed investment manager's 10-year tenure lasted from May

26 1983 until May 1993, after which the power to manage and administer the Pension Plan's

27
28 assets returned to the trustees.

22.     EBSA's most recent investigation before my February 2000 investigation was opened in August 1992 and involved a potential investment in a new San Francisco baseball stadium.  That investigation was closed in September 1993 and did not involve reviews of the Pension Plan's Annual Report Form 5500 or other financial documents.

**Administration Office and Frank Sullivan**

23.     The CBA is effective from July 1, 1997 to June 30, 2007.  Section 49 provides for the establishment of the Administration Office to handle record-keeping and the collection of deposits by employers for all the Local 38 Funds.   These administrative functions are authorized by a master trust agreement, the U.A. Local 38 Trust Agreement Administrative Trust Provisions Section 4 ("master trust agreement"), which has been incorporated into the separate trust agreements governing each plan.  [A true and correct copy of the CBA is attached hereto as Exh. 21, MZLA 0011301; a true and correct copy of the master trust agreement is attached hereto as Exh. 26, MZLA 0011356.]

24.     According to the master trust agreement, the Joint Board can engage the services of an Administrator who has the authority to establish and maintain an office; establish written procedures for collection of assets and income and payments of debts; make changes to procedures to enforce the rules of the plan such as those relating to eligibility to participate in the plan and the amounts and kinds of payments.  In addition, the Joint Board can delegate to the Administrator in writing the authority to hire and fire employees and service providers.  [A true and correct copy of the master trust agreement is attached hereto as Exh. 26, Section 4.2.7 MZLA 0011356, MZLA 0011361- MZLA 0011362.]  Although Section 49 of the CBA requires a written agreement between the Local 38 Funds and Administration detailing the services to be provided and costs, I found

no such agreement during my investigation. [A true and correct copy of the Report of Interview of Frank Sullivan taken July 12, 2002 is attached hereto as Exh. 27, ¶ 3 MZLA 0031396, MZLA 0031397.]

25.     In 1977, pursuant to section 4.2.7 of the master trust agreement, the Joint Board of Trustees appointed Mr. Sullivan as the Administrator for all the Local 38 Funds. [A true and correct copy of the excerpt from the Administrative Deposition of Frank Sullivan, taken September 2, 2003, is attached hereto as Exh. 28, MZLA 0001561 – MZLA 0001562.] Mr. Sullivan told me that he oversees the day to day operations of Administration [A true and correct copy of the Report of Interview of Frank Sullivan taken July 12, 2002, is attached hereto as Exh. 27 ¶ 10, MZLA 0031398.]

**Cash Flows among the Local 38 Trust Funds**

26.     The Administration office maintains two accounts in its name at Comerica Bank:  (1) the clearing account is used as the lockbox to receive employer contributions; and (2) the checking account is used to make transfers between the Local 38 Funds and to pay administrative expenses, which are shared jointly among the Funds that Mr. Sullivan administers.  [A true and correct copy of the excerpt from the Administrative Deposition of Frank Sullivan, taken September 2, 2003, is attached hereto as Exh. 28, MZLA 0001600.]

27.     The Local 38 ERISA Plans are funded by contributions from participating employers that are to be held in trust for plan beneficiaries.  Employer contributions are based on negotiated rate schedules.  Each month, HSBA, the third party administrator, sends each employer a pre-billing report detailing the names of employees covered and their wage and fringe benefit rate codes.  Each employer then calculates total fringe

1    benefits using the rate codes and forwards a single check covering all benefit plan

2    contributions to the lockbox account.  [A true and correct copy of the excerpted

3    accounting workpapers for the plan year ending June 30, 2001 is attached hereto as Exh.

4    29, MZLA 0026469 – MZLA 0026470, & MZLA 0026475.]

5    

6            28.      Operation of the Administration Clearing, or Lockbox, Account:  On a

7    daily basis, Comerica transfers employer contributions from the clearing account, also

8    referred to as the lockbox, to the individual accounts for the various Local 38 Funds in

9    accordance with "remittance banking instructions" from Mr. Sullivan.  The remittance

10    banking instructions specify the percentage of total contributions that will be deposited in

11    each of the Local 38 Funds.  According to Mr. Sullivan, the allocated amounts are based

12    on his estimate of the share each fund should receive based on his past experience and

13    given the work being done under current contracts at the bargained-for rates.  [A true and

14    correct copy of the Report of Interview of Frank Sullivan taken July 12, 2002, is attached

15    hereto as Exh. 27 ¶ 22 MZLA 0031399; a true and correct copy of the excerpted

16    accounting workpapers for the plan year ending June 30, 2001, is attached hereto as Exh.

17    29, MZLA 0026475.]  In addition, Mr. Sullivan transfers one-third of all employer

18    contributions intended for the Health & Welfare Plan to the Convalescent Fund directly

19    from the clearing account, before those funds are actually deposited into the Health &

20    Welfare Plan's account.  [A true and correct copy of the excerpt from the Administrative

21    Deposition of Frank Sullivan, taken September 2, 2003, is attached hereto as Exh. 28,

22    MZLA 0001617.]

23            29.      Operation of the Administration Checking Account:  Through electronic

24    withdrawals, Mr. Sullivan transferred cash from the ERISA plans and made deposits into

the Administration checking account.  Mr. Sullivan and the Administration Office

employees used ERISA Plans' cash  for various purposes, including to cover each Plan's

allocable share of common administrative expenses; to cover shortfalls in one Plan using

cash from other Plans; or to transfer cash into the Convalescent Fund to pay for Konocti-

related expenses.  [A true and correct copy of the Report of Interview of Mark

Eitelgeorge, CPA, taken June 12, 2002, is attached hereto as Exh. 30 ¶ 16 MZLA

0031373, MZLA 0031375; a true and correct copy of the excerpt from the Administrative

Deposition of Frank Sullivan, taken September 2, 2003, is attached hereto as Exh. 28,

MZLA 0001575 – MZLA 0001576.]

       30.     <u>Transfers from the Local 38 ERISA Plan Accounts</u>:  Mr. Sullivan has no

check-signing authority on any of Local 38 ERISA Plan bank accounts.  Checks under

$1000 are issued bearing facsimile signatures of Mr. Buckley, Chairman of the Joint

Board of Trustees, and Mr. Mazzola, Co-Chairman of the Joint Board.  Larger checks

require handwritten signatures of both a labor and a management trustee.  Disbursements

by check are reviewed at each meeting of the Joint Board.  [A true and correct copy of the

excerpted accounting workpapers for the plan year ending June 30, 2001 is attached hereto

as Exh. 29, MZLA 0026491; a true and correct copy of the excerpt from the

Administrative Deposition of Frank Sullivan, taken September 2, 2003, is attached hereto

as Exh. 28, MZLA 0001577 – MZLA 0001578.]  Despite the requirement for handwritten

signatures on large checks, Mr. Sullivan made electronic transfers of large sums money

out of one ERISA Plan account and into the Administration's Checking account without

review or approval of the Joint Board.

31.     It was not until after I began my February 2000 investigation that I or anyone at EBSA gained knowledge of Mr. Sullivan's practice of using these electronic transfers to funnel monies from the Pension Plan to the Convalescent Trust.

32.     Mr. Sullivan's practice of using ERISA plan monies to benefit the Convalescent Fund appeared to be inconsistent with section 4.2.6 of the master trust agreement, which requires that "[w]ithdrawals from the Fund may be made only upon the signature of [one union and one employer trustee.]"  [A true and correct copy of the master trust agreement is attached hereto as Exh. 26, MZLA 0011357, MZLA 0011361.]

33.     Messrs. Mazzola, Sullivan, and Brundage (Counsel for Local 38) stated that the power to transfer money among the various Local 38 Funds is located in sections 37(d) and 48(a) of the CBA, which they believed grants trustees and the union the authority to "reallocate" current assets and future contributions among the ERISA Plans and the non-ERISA Trust.  [A true and correct copy of the excerpt from the Administrative Deposition of Larry Mazzola, Sr., taken September 3, 2003, is attached hereto as Exh. 31, MZLA 0001189 – MZLA 0001193; a true and correct copy of the excerpts from the Administrative Deposition of Frank Sullivan, taken September 2, 2003, is attached hereto as Exh. 28, MZLA 0001711 – MZLA 0001719; and, a true and correct copy of the Report of Interview of Lawrence Mazzola, Sr. taken June 19, 2002 is attached hereto as Exh. 32 ¶ 30, MZLA 0031382.] Those provisions state, in relevant part:

> **Section 37(d)** Upon 30 days notice from the Union to the Associations, the Union shall have the right to reallocate any wages or fringes of any Trust Fund under this Agreement, with the exclusion of the Contract Administration Fund, and said allocations shall take effect at the end of the 30 day period.

> **Section 48(a)** The Board of Trustees shall have the power and discretion to review the financial needs of the Health and Welfare and Convalescent Trust and to effect the allocations to each respective trust at any time and to amend the Wage and

1  Fringe Benefit Addendum at any time to reallocate the contributions to each
2  respective trust.

3  [A true and correct copy of the CBA is attached hereto as Exh. 21, MZLA

4  0011301.]

5  34.     With the exception of Mr. Mazzola, all the trustees stated during either my

6  interviews or at their administrative depositions that they were unaware of Mr. Sullivan's

7  electronic transfers among the various Local 38 Funds.  These interviews and

8  administrative depositions took place after I began my investigation in February 2000;

9  before that date, neither I nor EBSA knew of Mr. Sullivan's electronic transfers or that the

10 trustees, excluding Mr. Mazzola, were ignorant of Mr. Sullivan's electronic transfers.

11 35.     Many of the trustees stated during their administrative depositions that they

12 were unaware that Mr. Sullivan transferred one-third of the Health & Welfare Plan's

13 employer contributions to the Convalescent Fund.  [A true and correct copy of the excerpt

14 from the Administrative Deposition of Arthur Rud, taken September 4, 2003, is attached

15 hereto as Exh. 11, MZLA 0001329 – MZLA 0001330; a true and correct copy of the

16 excerpt from the Administrative Deposition of Larry Mazzola, Jr., taken September 5,

17 2003, is attached hereto as Exh. 12, MZLA 0001034 – MZLA 0001035; true and correct

18 copy of the excerpt from the Administrative Deposition of Vohon Kazarian taken

19 September 5, 2003, is attached hereto as Exh. 15, MZLA 0000965; a true and correct copy

20 of the excerpt from the Administrative Deposition of James Shugrue, taken September 5,

21 2003, is attached hereto as Exh. 16, MZLA 0001401 – MZLA 0001404; a true and correct

22 copy of the excerpt from the Administrative Deposition of Robert Buckley, Jr., taken

23 September 4, 2003, is attached hereto as Exh. 18, MZLA 0000676 – MZLA 0000677; a

1   true and correct copy of the excerpt from the Deposition of Robert Thomas Nurisso, taken

2   September 3, 2003, is attached hereto as Exh. 19, MZLA 0001236.]

3       36.     Thus, what my investigation uncovered after it began in February 2000 was

4   that, without any oversight or authorization by the Board of Trustees, Mr. Sullivan freely

5

6   moved money from ERISA Plans to the Convalescent Fund, either directly or through the

7   Administration checking account.

8   **The Pension Plan**

9       37.     The Pension Plan is Local 38's largest ERISA-covered plan.  The Pension

10  Plan is a defined benefit plan which, with the appropriate amount of credited service,

11

12  generally provides full benefits upon Normal Retirement (age 65); early retirement

13  benefits upon attaining age 55; disability pension; and, death benefits to participants and

14  beneficiaries pursuant to the terms of the Plan and the CBA. [A true and correct copy of

15  the Plan Document is attached hereto as Exh. 33, MZLA 0011272.]  As of June 30, 2002,

16

17  employer contributions totaled over $10.5 million and the plan had 905 active participants.

18  [A true and correct copy of the Annual Report Form 5500 and attached financial statement

19  for the plan year ending June 30, 2002 is attached hereto as Exh. 34, MZLA 0009289,

20  MZLA 0009290 & MZLA 0009416.]

21

22      38.     Since 1993, Mr. Sullivan has transferred large sums out of the Pension

23  Plan's account and into the account of the Convalescent Fund, using the Administration

24  checking account as an intermediary.  These transfers of cash from the Pension Plan

25  account, along with accrued interest, are one component of an asset item on the Pension

26  Plan's financial statement, called a "Receivable Due from Administration."  The

27  Convalescent Fund's financial statement has a corresponding "Payable to Administration."

28

39.     Neither I nor anyone at EBSA had knowledge of these electronic transfers from the Pension Plan to the Convalescent Fund until after I began my investigation in February 2000.

40.     Based on a review of actuarial reports and Annual Reports Form 5500s, the Pension Plan's liabilities have exceeded its assets since at least June 30, 1994, and the gap is increasing.  The actuaries explained that the Pension Plan's total unfunded liability could be significantly greater than reported since $38 million (approximately 25% of the Pension Plan's assets) are comprised of the "Receivable Due from Administration."  The actuaries further explained that their projections depend on the "Receivable Due from Administration" earning 6.5%; otherwise, the funding status of the Pension Plan could be worse than detailed in the report.  [A true and correct copy of the Pension Plan's Actuarial Valuation for the plan year ending June 30, 2002 is attached hereto as Exh. 35, MZLA 0017192.]

41.     Based on the documents I reviewed and the interviews I conducted, the assets transferred from the ERISA Plans, whether transferred to the Convalescent Fund for Konocti or for some other purpose, are not memorialized in loan documents, contracts, or securities.  During the course of my investigation, I found no promissory notes, repayment terms, security agreements, security instruments, pledges of collateral, or loan covenants. [A true and correct copy of the Report of Interview of Frank Sullivan taken July 2, 2001, is attached hereto as Exh. 20, ¶¶ 9-10 MZLA 0031068; a true and correct copy of the Report of Interview of Mark Eitelgeorge taken June 12, 2002, is attached hereto as Exh. 30, ¶¶ 8-9 MZLA 0031374.]

42.     Neither I nor anyone at EBSA had knowledge of the facts referenced in Paragraph 41 before I began my investigation in February 2000.

43.     During the course of my investigation, I found no documents to memorialize the "Receivable Due from Administration" transfers shown on the Pension Plan's financial statements as a loan, investment or equity. I found no documents that would have given the Pension Plan the right to demand payment or enforce its right to repayment of the "Receivable Due from Administration." [A true and correct copy of the Report of Interview of Frank Sullivan taken July 2, 2001, is attached hereto as Exh. 20 ¶¶ 9-10 MZLA 0031068; a true and correct copy of the Report of Interview of Mark Eitelgeorge taken June 12, 2002, is attached hereto as Exh. 30 ¶¶ 8-9 MZLA 0031374.]

44.     Neither I nor EBSA had any knowledge of these circumstances described in Paragraph 43 before I began investigating the Pension Plan in February 2000.

45.     As I understand it, Mr. Mazzola's position is that the money represented by the "Receivable Due from Administration" is not a loan for which repayment is expected, but an investment in Konocti and that he views Konocti as a de facto asset of the Pension Plan. [A true and correct copy of the excerpt from the Administrative Deposition of Larry Mazzola, Sr. taken September 3, 2003, is attached hereto as Exh. 31, MZLA 0001099.]

46.     The documents I reviewed during my investigation in February 2000 confirmed that Konocti is owned by the Convalescent Fund and Lakeside Haven, a subsidiary to the Convalescent Fund, and that the status of Konocti's ownership has not changed since Mazzola I. [A true and correct copy of the CBA is attached hereto as Exh. 21 § 48(h), MZLA 0011301, 0011331; a true and correct copy of the Appraisal Of:

Konocti Harbor Resort & Spa dated July 2003 by Carneghi-Bautovich & Partners, Inc. is attached hereto as Exh. 10, MZLA 0106491, 0106517.]

47.     My investigation confirmed that the Pension Plan does not hold title to Konocti.

48.     My investigation disclosed that, although millions of dollars of Pension Plan money has, according to Mr. Mazzola, been spent on Konocti, the Pension Plan's "Receivable Due from Administration" is not supported by any ownership or security interest in Konocti's land, buildings, or furniture.

49.     During the course of my investigation, I reviewed documents, specifically the Pension Plan's Annual Forms 5500 and annual financial statements.  Nowhere in those documents is Konocti listed or mentioned as an asset of the Pension Plan.

**Other ERISA Plans**

50.     Pursuant sections 47 & 48 of the CBA, U. A. Local 38 sponsors several other ERISA-covered trust funds, including the Apprenticeship Fund, the Health & Welfare Plan, the Vacation & Holiday Fund, and the Scholarship Fund.  [A true and correct copy of the CBA is attached hereto as Exh. 21, MZLA 0011301, MZLA 0011328 – MZLA 0011333.]  As of June 30, 2004, the Apprenticeship Fund and the Vacation & Holiday Fund showed "Receivables Due from Administration" of over $4.4 million.  [A true and correct copy of the Administration Trust Funds financial statement for the plan year ending June 30, 2004, is attached hereto as Exh. 36, MZLA 00144862, MZLA 00144870.]

**The Convalescent Fund**

51.     The Convalescent Fund was established in May 1956 by trustors representing Local 38 and signatory employers and employer associations.  The original Convalescent trust agreement was amended several times, most recently on December 9, 1985.  [True and correct copies of the Convalescent Trust Agreements dated December 31, 1974 and November 30, 1978 are attached hereto as Exh.. 37, MZLA 0005365 – MZLA 0005411.]  The parties to the CBA select the trustee, and under the Convalescent trust agreement they may amend or terminate the trust and remove the trustee for cause. Trust Agreement §§ 4.5 and 4.7.

52.     Mr. Smith was first certified in his appointment as the Independent Trustee in September 1980.  [True and correct copies the Agreement to accept appointment and the Certification of Appointment are attached hereto as Exh. 38, MZLA 0004588; MZLA 0007105; MZLA 0013232.]

53.     On July 14, 2003, Mr. Sullivan memorialized a conversation between Mr. Mazzola and Scott Strawbridge, Northern California Mechanical Contractors Association, removing William W. Ward as the a Co-Trustee of the Convalescent Fund and appointing Richard L. Milsner.  In a letter dated June 7, 2004, Mr. Mazzola purportedly confirmed a second conversation appointing Richard L. Milsner the sole trustee effective June 1, 2004 due to the recent death of Mr. Smith.  [A true and correct copy of the June 7, 2004 letter from Larry Mazzola, Sr. to Scott Strawbridge is attached hereto as Exh. 39, MZLA 0030463.]

54.     In 1990, the Department determined that the Convalescent Fund was not an ERISA-covered "employee benefit plan" because the benefits provided by the trust did not clearly fall within the categories of benefits described in sections 3(1) or 3(2) of ERISA.

55.     The Convalescent trust agreement identifies three broad purposes of the trust: to operate and maintain Konocti (then known as Konocti Harbor Inn); to provide housing facilities and other services to meet the physical, social and psychological needs of retired employees; and to operate a summer camp for children of employees.  [A true and correct copy of the Convalescent trust agreement is attached hereto as Exh. 37, MZLA 0005367.]  In operation, permanent housing for retirees is no longer is offered, but the Convalescent Fund still operates Konocti, which gives preference and discounts to employees of participating employers (whether or not they are convalescing). [A true and correct copy of the Report of Interview of Gregory Bennett taken April 23, 2002, is attached hereto as Exh. 40, MZLA 0031326.]  The Convalescent Fund also operates Camp Konocti, the Local 38 summer camp, and hosts the Pension Plan's annual "retirees' week," which makes Konocti available for one week each year to the Plan's retirees.

56.     As described above, Mr. Sullivan transferred millions of dollars in cash to the Convalescent Fund from the bank accounts of Local 38's ERISA-covered plans which are reflected in the financial statements.  As I understand Mr. Mazzola's position, he does not view the Convalescent Fund as having any obligation to repay the Pension Plan or any other Local 38 ERISA Plan.  [A true and correct copy of the Report of Interview of Lawrence Mazzola, Sr. taken June 19, 2002, is attached hereto as Exh. 32, MZLA 0031382.]

57.     In any event, the Convalescent Fund has few sources of revenue.  My investigation discovered that Konocti, the only significant asset of the Convalescent Fund, is not and has never been profitable.  It was not until after I began my February 2000 investigation that EBSA learned that the Convalescent Fund has had recurring losses from

1   operations, negative working capital, and a net capital deficiency for more than ten years.

2   Every financial statement since the plan year ending December 31, 1996 of the

3   Convalescent Fund included the following note by the auditors:

4
5          The Fund has recurring losses from operations and has negative working capital
           and a net capital deficiency.  The Fund's ability to continue as a going concern is
6          dependent on increased and continued employers' contributions, and improved
           cash flows from operations.  These matters raise substantial doubt about the Fund's
7          ability to continue as a going concern.

8   I and EBSA had no knowledge of the Convalescent Fund's financial condition from the

9   mid-1990s to present until after I began my investigation in 2000.

10         58.     Pursuant to section 4.7 of the Convalescent trust agreement, the assets of

11  the Convalescent Fund will revert to the Pension Plan if the Convalescent Fund is

12  terminated by Local 38 and representatives of the employer parties to the collective

13  bargaining agreement, but only after all other debts of the Convalescent Fund have been

14
15  repaid.  [A true and correct copy of the Convalescent trust agreement is attached hereto as

16  Exh. 37, MZLA 0005367, 0005379.]

17         59.     As of the plan year ending December 31, 2003, the Convalescent Fund's

18  debts included:

19
20         a.      A promissory note in favor of Local 38, secured by a first deed of trust on

21  Konocti.  The note, originally in the amount of $6 million, had a balance of

22  $5,854,125.

23
24         b.      A payable to the Health & Welfare Plan of $4,781,993.

25         c.      A payable to Administration of $51,946,776.

26
27
28

1    [A true and correct copy of the Convalescent Fund's Annual Report Form 5500

2    and attached financial statements for the plan year ending December 31, 2003 is

3    attached hereto as Exh. 41, MZLA 0008552, MZLA 0008574.]

4
     60.    As stated above, the Convalescent Fund was to be administered by an
5
6    Independent Trustee.  As disclosed by my investigation, the Convalescent Fund appears to

7    have been in fact controlled by Messrs. Mazzola and Sullivan.  The following sequence of

8    events illustrates Mr. Mazzola's influence over Mr. Smith, the Independent Trustee at the

9    time.  In a letter to the Department of Labor, dated July 8, 2003, Mr. Smith responded to
10
11   the Department's warning that a sale of Konocti could be interpreted as a fiduciary act

12   with respect to the Pension Plan:

13       ON OR ABOUT 1978, MR FRANK SULLIVAN WAS DELEGATED
         "ADMINISTRATOR OF THE CONVALESCENT TRUST" SUBJECT
14       OF THIS CORRESPONDENCE...

15       HE AND THE ADVISORY MEMBERS FUNCTION IN THE
16       IMPLEMENTATION OF ALL MATTERS CONCERNING THE SAID
         TRUST.  I AM THE COSMETIC TRUSTEE.
17
18       I AM SEMI RETIRED, HOWEVER I AM USED TO SIGN
         IMPORTANT PAPERS.
19
20       CO TRUSTEES ATTEND NEEDS OF THE TRUST.

21       I WAS UNAWARE OF THE PENSION TRANSFERS.

22   [Sic original case, spelling and punctuation].  [A true and correct copy of the letter from
23
     M. Maroni Smith to William P. Tedesco dated July 8, 2003 is attached hereto as Exh. 42.]
24
         61.    Previously, in August 30, 2001, Mr. Smith told me he was "cosmetically" a
25
26   trustee of the Convalescent Fund.  [A true and correct copy of the telephone memorandum

27   of M. Maroni Smith, taken August 30, 2001, is attached hereto as Exh. 43 ¶ 5  MZLA

28   0031199, MZLA 0031200.]

1

2        62.      The following letter from Mr. Smith to Mr. Sullivan dated May 14, 1984

3    ("Re: Konocti") is representative of Mr. Smith's ceding of authority to Mr. Sullivan:

4         I am returning some material that has been referred to my office.

5         All administrative items such as repairs, maintenance supplies, etc., are
6         administrative problems and your administrative discretion is needed to
          pass on these items.  If for purposes of comfort you want me to initial them,
7         kindly affix your initials and have me give initials as well.

8         I rely completely on you as administrator as to the administration of
9         Konocti, and it is your discretion that is to be applied to the acceptance or
          refusal of all contractors and suppliers' applications for business.
10

11        The only admonition I make is that any of these contracts you accept you
          do so with the discretion that you have and exercise responsible application
12        and conclusions as to their reasonableness and appropriateness [sic].

13        At the your board meetings you should have a paragraph reciting all acts of
14        all agents in behalf of the trust are endorsed, embraced, ratified and
          approved both prospectively and retrospectively.
15

16        [A true and correct copy of the letter from M. Maroni Smith to Frank

17    Sullivan dated May 14, 1984 is attached hereto as Exh. 44, MZLA 0005028.]

18        63.      Mr. Smith was compensated $2500 per month by the Convalescent Fund

19    for what he estimated to be approximately 4 hours per week.  He stated in his

20    administrative deposition that he remained trustee of the Fund to pay for his medications.

21

22        Q:       So you plan to stay as the trustee of the convalescent trust until your death?

23        A:       So I can pay for my pharmaceuticals.

24        Q:       How much are you paid by the convalescent trust?

25        A:       $2500 a month.

26
          [A true and correct copy of the excerpts from the Deposition of M. Maroni Smith,
27
      taken July 29, 2003, is attached hereto as Exh. 45, MZLA 0001440; 0001514.]
28

**Konocti Operations and Capital Improvements Funded by ERISA Plans**

64.     The Convalescent Fund's primary asset is Konocti, a 255-room resort hotel located on Clear Lake in California. [A true and correct copy of the Appraisal Of: Konocti Harbor Resort & Spa dated July 2003 by Carneghi-Bautovich & Partners, Inc. is attached hereto as Exh. 10, MZLA 0106491, 0106497.] The hotel has no corporate status and does not file a tax return in its own name, although its losses are reflected in the tax returns and financial statements of the Convalescent Fund. [A true and correct copy of the Report of Interview of Mark Eitelgeorge taken October 17, 2001 is attached hereto as Exh. 46 ¶¶ 1 – 6 MZLA 0031290, MZLA 0031291.]

65.     During the course of my investigation I learned that, since at least 1993, Konocti has never been profitable and maintains an occupancy rate of around 45 percent. [A true and correct copy of the Appraisal Of: Konocti Harbor Resort & Spa dated July 2003 by Carneghi-Bautovich & Partners, Inc. is attached hereto as Exh. 10, MZLA 0106491, 0106544.] Without the cash infusions from the ERISA plans continued operation of the resort would not be possible.

66.     When I began my investigation, I researched Konocti's financial condition at the time of the investigation and worked backward in time to the earlier investigations and Mazzola I. By the time the Secretary filed the current lawsuit, my investigation had established Konocti's dire financial condition; however, before my investigation, neither I nor EBSA had any knowledge of Konocti's lack of profitability during the years at issue in this lawsuit.

67.     Mr. Mazzola hired Gregory Bennett ("Mr. Bennett") to be Konocti's general manager in 1990. [A true and correct copy of the excerpt of the Deposition of

1   Gregory Bennett taken October 28, 2003 is attached hereto as Exh. 47, MZLA 000398.]

2   Between 1996 and 2002, Mr. Bennett made extensive improvements and renovations to

3   the Konocti complex using the cash infusions from the Local 38 Funds.  Mr. Bennett

4   completely remodeled all guest rooms, managers' apartments, common areas, and

5   grounds, installed a new sewage treatment plant and water purification facility, and

6   

7   replaced all roofs.  Other capital improvements included: a concert hall, amphitheater,

8   meeting center, swimming pools, decorative fountains, stone work, landscaping (including

9   palm trees), irrigation systems, rebuilt docks, and boats.[2]  [True and correct copies of

10  schedules of fixed asset additions prepared at Frank Sullivan's direction dated June 11th

11  and July 30th 2003 are attached hereto as Exh. 48, MZLA 0028446 and 0028374.]

12  

13          68.     According to Mr. Sullivan, the costs of the "fixed asset additions" between

14  1996 and 2002 totaled approximately $39.5 million.  [True and correct copies of schedules

15  of fixed asset additions prepared at Frank Sullivan's direction dated June 11th and July 30th

16  

17  2003 are attached hereto as Exh. 48, MZLA 0028446 and 0028374.]

18          69.     Messrs. Sullivan and Mazzola have made all the decisions regarding

19  improvements at Konocti.  [A true and correct copy of the excerpt of the Administrative

20  Deposition of Larry Mazzola, Sr. taken September 3, 2003 is attached hereto as Exh. 31,

21  MZLA 0001083 and MZLA 0001094; a true and correct copy of the excerpt of the

22  

23  Administrative Deposition of M. Maroni Smith taken July 29, 2003, is attached hereto as

24  Exh. 45, MZLA 1501 – MZLA 0001503; a true and correct copy of the excerpt of the

25  Administrative Deposition of Gregory Bennett taken October 28, 2003 is attached hereto

26  

27  _____

28  [2] Konocti has nearly 100 boat slips and a fleet of over 40 vessels, including Waverunners, ski boats, fishing boats, kayaks, paddleboats, and the Konocti Princess, an 80-passenger, Mississippi-style paddle wheeler.

as Exh. 47, MZLA 0000541 – MZLA 0000542.]  Mr. Bennett took no direction from, and

did not report to Mr. Smith or the Joint Board.  [A true and correct copy of the excerpt of

the Administrative Deposition of Gregory Bennett taken October 28, 2003, is attached

hereto as Exh. 47, 0000490 – MZLA 0000491.]  While Mr. Smith approved of or

acquiesced in every capital expense and improvement for Konocti, these expenses were

authorized by Messrs. Sullivan and/or Mazzola.

**Joint Board of Trustees**

      70.     The Administrative Trust Agreement imposes on all trustees the basic

fiduciary duties mandated by ERISA, including acting for the exclusive purpose of

providing benefits to plan participants; prudent administration; and diversification of trust

assets.  The agreement also restricts fiduciaries from self-dealing and prohibited

transactions and imposes liability for fiduciary breaches and co-fiduciary liability.   Trust

agreement §§ 4.3 and 4.4.  [A true and correct copy of the Trust Agreement is attached

hereto as Exh. 26, MZLA 0011356.]

      71.     Based on my review of plan documents and administrative depositions, the

trustees were uninformed of many of the financial aspects of the ERISA Plans under their

supervision.  For example, the trustees, with the exception of Mr. Mazzola,[3] claim to know

nothing about the transfer of assets from the Pension Plan to the Convalescent Fund,

despite the fact that the growing "Receivable Due from Administration" was reported

annually on the Pension Plan's financial statements and independent auditor's reports.

---

[3] When discussing the lack of involvement of the Trustees, I am referring to all Trustees
on the Joint Board, except Co-Chairman Larry Mazzola, Sr., who generally knew and/or
approved of the fiduciary breaches described in this declaration.

72.     No trustee could admit to having seen a financial statement for any of the Funds under their supervision.

73.     Most of the trustees had no knowledge of Mr. Sullivan's electronic transfers of cash from the ERISA Plan accounts to the Administration checking account and ultimately to the Convalescent Fund.

74.     Although the Joint Board holds meetings on a quarterly basis, Messrs. Mazzola and Sullivan controlled the agendas for the meetings and determined what documents to provide to the Trustees. [A true and correct copy of the excerpt from the Administrative Deposition of Robert Buckley, Sr. taken September 4, 2003, is attached hereto as Exh. 17, MZLA 0000697 – MZLA 0000698; and, a true and correct copy from the excerpt from the Administrative Deposition of Larry Mazzola, Sr. taken September 3, 2003, is attached hereto as Exh. 31, MZLA 0001057 – MZLA 0001058.] None of the trustee meeting minutes that I reviewed during the course of my investigation contained any reference to Pension Plan's "Receivable Due from Administration," or the electronic transfer of ERISA plan funds to Konocti.  [A true and correct copy of a summary of the Pension Plan's Joint Board Minutes is attached hereto as Exh. 49.]

75.     While the Pension Plan's other real estate investments and all other assets are under the management of professional investment money managers, its "Receivable Due from Administration" is not.

76.     During my investigation, Mr. Sullivan claimed that the Trustees oversaw his work. [A true and correct copy of the Report of Interview of Frank Sullivan taken July 12, 2002 is attached hereto Exh. 27, ¶ 5 MZLA 0031397.]  However, all evidence compiled during the investigation indicated that, in reality, the trustees, other than Mr.

Mazzola, did not oversee his work and, for the most part, were not aware of his work, particularly with respect to the electronic transfers.  Mr. Sullivan took little direction from the Joint Board, other than Mr. Mazzola.  In fact, the Trustees had only a vague comprehension of Mr. Sullivan's duties and who was responsible for supervising him.  [A true and correct copy of the excerpt of the Administrative Deposition of Frank Sullivan taken September 2, 2003 is attached hereto as Exh. 28, MZLA 0001578.]

77.     My review of the Joint Board meeting minutes for the Pension Plan disclosed no reports from consultants, advisers, or investment managers ever reported to the Joint Board regarding these expenditures in connection with Konocti or transfers to the Convalescent Trust.  [A true and correct copy of the excerpt of the Administrative Deposition of Frank Sullivan taken September 2, 2003 is attached hereto as Exh. 28, MZLA 0001578.]

78.     Mr. Mazzola, who was aware of Mr. Sullivan's electronic transfers, did nothing to evaluate the soundness of the decision to continue to spend millions of dollars of ERISA plan money on Konocti.  [A true and correct copy of the excerpt of the Administrative Deposition of Frank Sullivan taken September 2, 2003 is attached hereto as Exh. 28, MZLA 0001578.]  To the extent the money was used to improve Konocti, during my investigation, I saw no documents indicating the Messrs. Mazzola or Sullivan, or any of the trustees, requested current appraisals, feasibility studies, demographic reports, valuations, cost-benefit analyses, risk/return analyses or the advice of any professional investment advisor or manager before ERISA monies were spent.

79.     To the extent the ERISA funds were spent on items other than Konocti, I saw no documents during my investigation indicating that the trustees made any effort to

1   identify where the money went and whether it was being spent in such a way that the

2   ERISA Plans would receive a reasonable rate of return.  I saw no timely appraisals or

3   appraisals that supported the amounts of the electronic transfers, feasibility studies,

4   demographic reports, valuations, cost-benefit analyses, risk/return analyses or a request for

5   advice from any professional investment advisor or manager before ERISA monies were

6

7   spent.

8        80.      As of August 10, 2001, I had spent only about 12 days investigating this

9   case, in part because Mr. Sullivan had been slow in providing documents.   [A true and

10  correct copy of my August 10, 2001 Case Review is attached hereto as Exh. 50, MAZ

11  003421-3422.  By December 6, 2001, I had spent about 34 days in total on the case and

12

13  was still in the midst of conducting interviews and obtaining documents.  [A true and

14  correct copy of my December 12, 2001 Case Review is  attached hereto as Exh. 51, MAZ

15  003428-3430.]

16

17  **IV.  CONCLUSION**

18       81.      Based on the documents reviewed and the results of my investigation, it

19  does not appear that the Joint Board, with the exception of Mr. Mazzola, informed

20  themselves of Mr. Sullivan's electronic withdrawals of ERISA plan funds, or that he

21

22  sought approval from the Joint Board before making the cash transfers.  The electronic

23  expenditures are represented as an item "ERISA Plans' Receivable."  Neither the transfers

24  nor the Receivables are supported by promissory notes, loans agreements, agreements to

25  repay, contracts, security agreements, guarantees or deeds of trust.  Mr. Mazzola never

26  informed the other members of the Joint Board of Mr. Sullivan's electronic withdrawals.

27

28  Had the other members of the Joint Board at a minimum reviewed the financial

1   statements, it would have been alerted to the ever-increasing receivable and prompted to

2   conduct additional inquiry.  [A true and correct copy of the excerpt from the

3   Administrative Deposition of Arthur Rud, taken September 4, 2003, is attached hereto as

4
5   Exh. 11, MZLA 0001316; a true and correct copy of the excerpt from the Administrative

6   Deposition of Ron Fahy, Jr., taken September 4, 2003, is attached hereto as Exh. 13,

7   MZLA 0000832; a true and correct copy of the excerpt from the Administrative

8   Deposition of Vohon Kazarian taken September 5, 2003, is attached hereto as Exh. 15,

9
10  MZLA 0000975 – MZLA 0000976; a true and correct copy of the excerpt from the

11  Administrative Deposition of Robert Buckley, Sr., taken September 5, 2003, is attached

12  hereto as Exh. 17, MZLA 0000747.]

13          I declare under penalty of perjury of the laws of the United States that the

14  foregoing is true and correct, and that this declaration was executed on January 30, 2007

15  in San Francisco, California.

16

17

18                                          KARL SPARGUR

19

20

21

22

23

24

25

26

27

28