WAYNE R. BERRY, DC BN 429661
PETER B. DOLAN, IL BN 0065 0285
W. IRIS BARBER, DC BN 436398
MEGAN E. GUENTHER, MD Bar (numbers not used)
Office of the Solicitor
United States Department of Labor
200 Constitution Avenue, N.W., Room N-4611
Washington, DC  20210
Telephone: (202) 693-5600, Facsimile: (202) 693-5610
berry.wayne@dol.gov; dolan.peter@dol.gov
barber.iris@dol.gov; guenther.megan@dol.gov

Attorneys for the Plaintiff
ELAINE L. CHAO, Secretary of Labor
UNITED STATES DEPARTMENT OF LABOR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELAINE L. CHAO, Secretary of Labor, UNITED STATES DEPARTMENT OF LABOR, | Civil Case No. C 04-4949 PJH (EMC) |
| Plaintiff, | |
| v. | |
| LAWRENCE J. MAZZOLA, et al., | |
| Defendants. | |

SECRETARY OF LABOR'S
OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

Date:   March 7, 2007
Time:   9:00 a.m.
Court:  Courtroom 3, 17th Floor
Judge:  Hon. Phyllis J. Hamilton

# TABLE OF CONTENTS

Page

I.      SUMMARY OF ARGUMENT.................................................................. 1

II.     STATEMENT OF FACTS.................................................................... 6

        A.      The Secretary's Case Against Defendants........................................ 6

        B.      Plan Administration and Fiduciaries' Duties..................................... 8

        C.      The Mazzola I Litigation .................................................. 9

        D.       Subsequent Investigations ............................................... 10

        E.      The Secretary's 2000 Investigation and Tolling Agreements............ 12

III.    ARGUMENT …………………………………………………………14

        A.  Defendants' Burden of Proof  ........................................................ 14

        B.  Defendants Cannot Establish that the Secretary is
            Barred by the Actual Knowledge Prong of ERISA's
            Statute of Limitations ...................................................................... 15

        C.  There is No Evidence that the Secretary Obtained
            Actual Knowledge of Imprudent Cash Transfers
            in Mazzola I…................................................................. 16

        D.  There is No Evidence that the Secretary Obtained
            Actual Knowledge as a Result of Investigations in
            the 1980s and 1990s ........................................................................ 18

        E.  There is No Evidence that the Secretary Obtained
            Actual Knowledge as a Result of the IRS Referral  ........................ 20

        F.  The Statute of Limitations Does Not Bar the Secretary from
            Enforcing ERISA Against the Fiduciaries for Post-1995
            Imprudent Transfers ....................................................................... 22

        G.  Pre-1988 Forms 5500 Do Not Give the Secretary
            Constructive Knowledge of the Post-1995 Diversions
            of ERISA Plan Assets...................................................................... 26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    H.  The Court Should Reject the Defendants' Statute
of Limitations Arguments Concerning Local 38, the
Convalescent Fund, Lakeside Haven, and
Rule 19(a) Parties ............................................................................ 28

    I.   The Affirmative Defense of Res Judicata is Baseless ...................... 29

    J.   The Affirmative Defenses of Waiver and Unclean
Hands are Specious .......................................................................... 31

    K.  There is Sufficient Evidence on the Secretary's
Claim Regarding Local 38's Loan to the Convalescent
Fund... ............................................................................................... 33

IV.    CONCLUSION................................................................................................ 35

1

## TABLE OF AUTHORITIES

2

Page

3

Anderson v. Liberty Lobby, Inc.,
4
    477 U.S. 242 (1986) ................................................................................... 14

5

Belmontes v. Brown,
6
    414 F.3d 1094 (9th Cir. 2005) ................................................................... 32

7

Blanton v. Anzalon,
8
    760 F.2d 989 (9th Cir. 1985) ..................................................................... 15

9

Boekman v. A.G. Edwards,
10
    461 F. Supp. 2d 801 (S.D. Ill. 2006) ......................................................... 32

Brock v. Nellis,
11
    809 F.2d 753 (11th Cir. 1987) ................................................................... 15

12

Brother Records v. Jardine,
13
    318 F.3d 900 (9th Cir. 2003) ....................................................................... 5

14

Buccino v. Cont'l Assurance Co.,
15
    578 F. Supp. 1518 (S.D.N.Y. 1983) ......................................................... 23

16

Central Delta Water Agency v. U.S.,
17
    306 F.3d 938 (9th Cir. 2002) ................................................................. 4,30

18

Chao v. Chermak,
    No. 1:05CV1935, 2006 WL 3751191 (N.D. Ohio Dec. 18, 2006) .............. 5,32
19

Chao v. Hall Holding Co., Inc.,
20
    285 F.3d 415 (6th Cir. 2002) ............................................................. 14, 33

21

Cline v. Indus. Maint. Eng'g & Contracting Co.,
22
    200 F.3d 1223 (9th Cir. 2000) ................................................................... 17

23

Dillon v. Dole,
24
    11 Empl. Benefits Cas. (BNA) at 2187 ..................................................... 32

25

Dole v. Formica,
26
    14 Empl. Benefits Cas. (BNA) 1397 (N.D. Ohio 1991) ............................. 23, 27

27

Donovan v. Bierwirth,
    680 F.2d 263 (2d Cir.), cert. denied, 459 U.S. 1069 (1982) ........................ 5,32
28

**Secretary's Opposition to Defendants' Motion for Summary Judgment**
**C 04-4949 PJH (EMC)**
    iii

<u>Donovan v. Cunningham</u>,
    716 F.2d 1455 (5th Cir. 1983), <u>cert. denied</u>,
    467 U.S. 1251 (1984) ................................................................ 33

<u>Donovan v. Mazzola</u>,
    No. C-79-134 SAW, 1981 U.S. Dist. LEXIS 17411 (N.D. Cal. Nov. 17, 1981),
    <u>judgment entered</u>, 1982 U.S. Dist LEXIS 18412 (N.D. Ca. July 6, 1982), <u>aff'd</u>, 716
    F.2d 1226 (9th Cir. 1983), <u>cert. denied</u>, 464 U.S. 1040 (1984) .................... passim

<u>Donovan v. Mazzola</u>,
    716 F.2d 1226 (9th Cir. 1983), <u>cert. denied</u>, 464 U.S. 1040 (1984) ............. 2,5,9,32

<u>Donovan v. Robbins</u>,
    99 F.R.D. 593 600 (N.D. Ill. 1983) ............................................... 33

<u>Donovan v. Schmoutey</u>,
    592 F. Supp. 1361 (D. Nev. 1984) ............................................... 33

<u>Durney v. Wavecrest Labs., LLC</u>,
    441 F. Supp. 2d 1055 (N.D. Cal. 2005)........................................... 30

<u>Fink v. Nat'l Sav. & Trust Co.</u>,
    772 F.2d 951 (D.C. Cir. 1985) .................................................. 27

<u>Frank v. United Airlines, Inc.</u>,
    216 F.3d 845 (9th Cir. 2000)................................................... 30

<u>Gluck v. Unisys Corp.</u>,
    960 F.2d 1168 (3d Cir. 1992) .................................................. 15

<u>Gruby v. Brady</u>,
    838 F. Supp. 820 (S.D.NY. 1993) ............................................... 23

<u>Harkins Amusement Enters. v. Harry Nace Co.</u>,
    890 F.2d 181 (9th Cir. 1989).................................................... 30

<u>Hells Canyon Preservation Council v. U.S. Forest Serv.</u>,
    403 F.3d  683 (9th Cir. 2005).................................................. 4,30

<u>Herman v. South Carolina Nat'l Bank</u>,
    140 F.3d 1413 (11th Cir. 1998), <u>cert. denied</u>, 525 U.S. 1140 (1999) ........... 5,32

<u>Hughes v. United States</u>,
    701 F.2d 56 (7th Cir. 1982) (per curiam) ....................................... 21

Intel Corp. v. Hartford Accident & Indemnity,
        952 F.2d 1551 (9th Cir. 1991) .................................................................. 31-32

Kayes v. Pac. Lumber Co.,
        51 F.3d 1449 (9th Cir. 1995), cert. denied, 516 U.S. 914 (1985) ................ 33

Local Union 2134, United Mine Workers v. Powhatan Fuel,
        828 F.2d 710 (11th Cir. 1987)................................................................. 17

Marshall v. Jerrico, Inc.,
        446 U.S. 238 (1980) ................................................................................ 32

Martin v. Consultants & Adm'rs,
        966 F.2d 1078 (7th Cir. 1992)........................................................... passim

Martin v. Murphy,
        815 F. Supp. 1451 (S.D. Fla. 1993).............................................. 26,27,28

Martin v. Nat'l Bank of Alaska,
        828 F. Supp. 1427 (D. Alaska 1992)........................................ 5,14,33,35

Martin v. Pac. Lumber Co.,
        No. C-91-1812 SBA, 1993 WL 832744 (N.D. Cal. Jan. 15, 1993) .............3,15,21

Meagher v. Int'l Ass'n of Machinists & Aerospace Workers,
        856 F.2d 1418 (9th Cir. 1988)................................................... 4,25,29

NYSA-ILA Med. & Clinical Servs. Fund. v. Catucci,
        60 F. Supp. 2d 194 (S.D.N.Y. 1999)......................................... 23,26,27

Paulsen v. CNF, Inc, No. C 03-03960, 2006 U.S. Dist. LEXIS 94199
        (N.D. Cal. Dec. 22, 2006)......................................................... 32

Phillips v. Alaska Hotel & Rest. Employees Pension Fund,
        944 F.2d 509 (9th Cir. 1991), cert. denied, 504 U.S. 911 (1992) ............ 23,24,25,26

Piscotta v. Teledyne Indus. Inc.,
        91 F.3d 1326 (9th Cir. 1996)..................................................... 24

Reich v. Compton,
        57 F.3d 270 (3d Cir. 1995)..................................................... 5,35

Reich v. Lancaster,
        55 F.3d 1034 (5th Cir. 1995)..................................................... 16,27,28

Schar v. Hartford Life Ins.,
    242 F. Supp. 2d 708 (N.D. Cal. 2003)..........................................................32

Scheimer v. Nat'l Capital Region, Nat'l Park Serv.,
    737 F. Supp. 3 (D.D.C. 1990). .......................................................................4

U.S. v. Masons Tenders Dist. Council of Greater New York,
    909 F. Supp. 882 (S.D.N.Y. 1995) ...............................................................21

Waller v. Blue Cross of California,
    32 F.3d 1337 (9th Cir. 1994).........................................................................15

Ziegler v. Connecticut Gen. Life Ins. Co.,
    916 F.2d 548 (9th Cir. 1990)..........................................................................25

**Statutes and Rules:**

Employment Retirement Income Security Act of 1974, as amended,
    29 U.S.C. § 1001, et seq.:

Section 3(14)(A), 29 U.S.C. § 1002(14)(A) ................................................34

Section 3(14)(D), 29 U.S.C. § 1002(14)(D)................................................34

Section 404, 29 U.S.C. § 1104 .................................................................8,32

Section 404(a)(1), 29 U.S.C. § 1104(a)......................................................25

Section 406, 29 U.S.C. § 1106 .......................................................9,25,32,33

Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).......................................33,35

Section 410, 29 U.S.C. § 1110 .....................................................................32

Section 413, 29 U.S.C. § 1113 .......................................................15,26,27,29

Section 3004, 29 U.S.C. § 1204 ...................................................................22

26 U.S.C. § 6103 ...........................................................................................22

26 U.S.C. § 6103(l)(2)....................................................................................22

///

Fed. R. Civ. P. 11 ........................................................................................ 21

Fed. R. Civ. P. 19 ........................................................................................ 29

Fed. R. Civ. P. 19(a)............................................................................. 28, 29

Fed. R. Civ. P. 56(c)................................................................................... 14

Plaintiff Elaine L. Chao, Secretary of Labor, United States Department of Labor ("Secretary"), opposes Defendants' Motion for Summary Judgment and asks this Court not only to deny it but also to enter judgment in her favor on her Fourth Claim, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Civil Local Rule 56-1, and order that none of her claims are barred by the statute of limitations, res judicata, waiver or unclean hands. The Trustee Defendants,[1] Frank Sullivan, and U.A. Local 38 have no defenses to the Secretary's Amended Complaint and are liable for violating ERISA as described herein and in the Secretary's Motion for Partial Summary Judgment, filed on January 31, 2007.

## I. SUMMARY OF ARGUMENT

This case is about Defendants' complete disregard of their fiduciary responsibilities in causing or permitting the diversion of more than $50.5 million in ERISA Plan assets to the Convalescent Fund, a non-ERISA entity whose primary asset was the perennially unprofitable Konocti Harbor Resort and Spa ("Konocti"). Before pouring cash from five ERISA Plans[2] into the Convalescent Fund and Konocti, the fiduciaries performed no investigation, analysis or review about whether the expenditure was a proper or prudent investment. They also failed to document or obtain security for the cash transfers in any way that would enable the ERISA Plans to collect on the amounts owed to them. To this day, the ERISA Plans have received no return of principal or interest on the tens of millions of dollars spent on the Convalescent Fund and Konocti. This conduct demonstrates Defendants' failure – absolute and unmitigated – to honor their fiduciary obligations to protect the ability of the ERISA Plans to provide pension, health and other benefits to their participants and beneficiaries.

---

[1] The Trustee Defendants are Lawrence J. Mazzola ("Mazzola Sr."), Robert E. Buckley, Lawrence J. Mazzola, Jr., William B. Fazande, Larry Lee, James R. Shugrue, Vohon J. Kazarian, Tom Irvine, Robert Buckley, Jr., Art Rud, Ron Fahy and Robert Nurisso.

[2] The ERISA Plans are the U.A. Local 38 Pension Trust, Health & Welfare Trust, Apprentice & Journeyman Training Trust, Vacation & Holiday Trust and Scholarship Trust Funds (collectively, the "ERISA Plans"). The ERISA Plans and the Convalescent Fund are sometimes collectively referred to as the Local 38 Trusts.

1    Defendant's Motion for Summary Judgment is notable for what it does not say.

2 Defendants have never argued that they acted prudently.  Their Motion makes no argument

3 that their conduct was at all consistent with the duties imposed by ERISA or their own trust

4 agreements.  To make matters worse, this is not the first time that Local 38 Plan trustees

5 have been sued for breaching their fiduciary duties.  See Donovan v. Mazzola, No. C-79-

6 134 SAW, 1981 U.S. Dist. LEXIS 17411 (N.D. Cal. Nov. 17, 1981), judgment entered,

7 1982 U.S. Dist LEXIS 18412 (N.D. Cal. July 6, 1982), aff'd, 716 F.2d 1226 (N.D. Cal.

8 1982), cert. denied, 464 U.S. 1040 (1984) (collectively "Mazzola I").  Rather than learn

9 from past mistakes, Defendants now argue that because of Mazzola I, they should get a free

10 pass to violate ERISA the second time around on the basis of their affirmative defenses of

11 statute of limitations, res judicata, waiver and unclean hands.

12    Defendants' facts, even if completely true and undisputed, do not provide a basis on

13 which to grant their Motion.  There is no evidence – not a single fact – to show that the

14 Secretary had actual knowledge of the fiduciary violations at issue in this case beyond the

15 statute of limitations period.  The chronology relevant to the issue of the statute of

16 limitations establishes that the Secretary's claims are all timely:

17 | October 1995 | Initial date of imprudent transfers at issue in this case |
18 | November 4, 1999 | Date that IRS made referral to the Secretary |
   | February 2000 | Date that Secretary's investigation began |
19 | September 18, 2001 | Effective date of tolling agreement |
   | November 22, 2004 | Secretary's Complaint filed |
20
21 As is apparent from this timeline, the Secretary's tolling agreement preserves all claims

22 relating to the post-1995 imprudent transfers, as well as any duty to collect or make demand

23 for payment of amounts owed to the Plans as of that date.  For the parties with whom the

24 Secretary did not enter into a tolling agreement, she may bring suit for claims that occurred

25 within six years of the date of her complaint, or at the very least, three years before.

26    Defendants' affirmative defenses depend on a finding that the Secretary knew all of

27 the material facts on the elements of her current claims prior to September 18, 1998, which

28 is three years before the tolling agreement was executed.  Their Motion fails to show that
   the Secretary knew all of the material facts:  that they imprudently diverted cash to the

1   Convalescent Fund; that the trustees were generally ignorant of those transfers; that they
2   exercised no oversight over plan administration; that there were no promissory notes or
3   collateral to protect the Plans' interests with respect to the diversions of cash; that the
4   Convalescent Fund's financial condition was poor; or that Konocti suffered recurring losses.

5       Defendants' entire defense rests on inferences drawn from historical facts that are
6   immaterial to this case:  that in <u>Mazzola I</u> the Secretary learned about their interfund
7   accounting system, Konocti's unprofitability, and some interfund transfers; and that in a
8   1989 investigation she learned of cash transfers from the Health & Welfare Plan.  From
9   these facts, they leap to the unfounded conclusion that the Secretary knew all along that the
10  fiduciaries would imprudently transfer ERISA Plan assets to the Convalescent Fund in the
11  future from 1995 to 2004 and is barred from enforcing ERISA against them.

12      Even assuming for purposes of this motion that the Secretary had knowledge in the
13  1970s and 1980s about their interfund accounting system, Konocti's financial problems and
14  certain cash transfers, this does not equate – without more facts – to knowledge of ERISA
15  breaches related to the transfers at issue.  With the exception of the Health & Welfare Plan,
16  the Secretary had no knowledge during that period that Defendants were imprudently and
17  disloyally diverting ERISA Plan assets for the benefit of the Convalescent Fund and
18  Konocti because she had not conducted an investigation of any such transfers.  <u>See</u> <u>Martin</u>
19  <u>v. Pac. Lumber Co.</u>, No. C-91-1812 SBA, 1993 WL 832744 (N.D. Cal. Jan. 15, 1993).

20      As for the Health & Welfare Plan, Defendants' argument is much ado about nothing.
21  The Secretary did not allege in <u>Mazzola I</u>, and does not allege here, that the reallocation of
22  Health & Welfare employer contributions violated ERISA, and there is no dispute that the
23  Secretary believed that the advancing of "excess" Health & Welfare Plan assets had been
24  corrected.  Moreover, the Secretary seeks only prospective injunctive relief as to that Plan.

25      After the 1989 investigation, the Secretary did not investigate cash transfers until the
26  February 2000 investigation that led to this case.  Moreover, until 1995, the financial
27  statements for the ERISA Plans did not reflect cash transfers that are to be repaid by the
28  Convalescent Fund.  Thus, Defendants' statute of limitations defense should be rejected

1   because there is not a single fact to show that the Secretary knew of the transfers at issue for

2   more than three years before the statute of limitations was tolled.

3          Even if the Secretary knew that the fiduciaries had violated ERISA in making cash

4   transfers in the earlier decades, knowledge of past violations is not actual knowledge of

5   future violations.  See Martin v. Consultants & Adm'rs, 966 F.2d 1078, 1087-88 (7th Cir.

6   1992).  Each imprudent and disloyal transfer of ERISA Plan assets by the fiduciaries

7   triggered a new and separate breach, which in this case occurred after October 1995 and

8   within the statute of limitations.  See Meagher v. Int'l Ass'n of Machinists & Aerospace

9   Workers, 856 F.2d 1418, 1423 (9th Cir. 1988).

10         Defendants' argument that the statute of limitations began to accrue in December

11  1998, when the Internal Revenue Service ("IRS") began its audit of the Pension Plan or in

12  November 1999, when it referred the Plan for investigation of possible fiduciary breaches,

13  is not supported by the facts or the law.  The Secretary's agreement tolling the statute of

14  limitations became effective on September 18, 2001, less than three years after the start of

15  the audit and the date of the referral.  Therefore, her claims are timely.  Moreover, the

16  referral itself did not convey actual knowledge of the breaches because the IRS asked the

17  Secretary to investigate whether ERISA breaches took place.  Finally, Defendants do not

18  cite a single case in which knowledge by the IRS has ever been imputed to the Secretary.

19  In fact, knowledge held by one agency generally is not imputed to another.  Scheimer v.

20  Nat'l Capital Region, Nat'l Park Serv., 737 F. Supp. 3, 5 (D.D.C. 1990).  Without material

21  facts to establish knowledge or legal authority imputing knowledge, this defense must fail.

22         Similarly, the defense of res judicata is without merit.  Defendants offer no facts to

23  support their contention that imprudent and disloyal transfers had occurred during the

24  Mazzola I investigation, that the Secretary knew about them and that she could have

25  litigated the issue then.  Certainly, the imprudent and disloyal transfers of plan assets from

26  October 1995 to 2004 could not have been litigated in Mazzola I because they had not yet

27  occurred.  See  Hells Canyon Preservation Council v. U.S. Forest Serv., 403 F.3d 683, 690-

28  91 (9th Cir. 2005); Central Delta Water Agency v. U.S., 306 F.3d 938, 953 (9th Cir. 2002).

1    Finally, Defendants assert the equitable defenses of waiver and unclean hands to

2   avoid liability for their astounding mismanagement of $50.5 million in ERISA Plan assets.

3   In 1979, the Secretary sued them for ERISA violations and won.  In 1992, after being

4   promised that transfers from the Health & Welfare Plan would be corrected, the Secretary

5   closed her 1989 investigation.  In 2000, she opened the current investigation and in 2002,

6   she advised Defendants of possible ERISA violations in connection with the imprudent and

7   disloyal transfers of cash, but Defendants continued to make the transfers.  In 2004, the

8   Secretary filed this lawsuit.  There is absolutely no basis on which a finding can be made

9   that the Secretary knowingly relinquished her right to enforce ERISA against these plan

10   fiduciaries or acted fraudulently or deceitfully.  See Herman v. South Carolina Nat'l Bank,

11   140 F.3d 1413, 1423 (11th Cir. 1998) cert. denied, 525 U.S. 1140 (1999); Chao v. Chermak,

12   No. 1:05CV1935, 2006 WL 3751191, at *4 (N.D. Ohio Dec. 18, 2006); Brother Records v.

13   Jardine, 318 F.3d 900, 909-10 (9th Cir. 2003).  The Court should hold the fiduciaries to the

14   standard of care that is "the highest known to the law," Mazzola, 716 F.2d at 1231-32;

15   Donovan v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir.), cert. denied, 459 U.S. 1069 (1982),

16   and enter an order that they cannot avail themselves of these equitable defenses against the

17   Secretary.

18    Defendants seek summary judgment on the Secretary's Fourth Claim for relief,

19   which alleges that Defendants transferred ERISA assets to the Convalescent Fund for the

20   benefit of Local 38.  Not only is it undisputed that the Convalescent Fund received ERISA

21   Plan assets, but also that ERISA Plan assets were used for repayment of the Convalescent

22   Fund's debt to Local 38.  Thus, Local 38, as a party in interest, benefited from the use of

23   plan assets and summary judgment should be entered against Defendants on the Fourth

24   Claim.  See Reich v. Compton, 57 F.3d 270, 281 (3d Cir. 1995); Martin v. Nat'l Bank of

25   Alaska, 828 F. Supp. 1427, 1434 (D. Alaska 1992).

26    As discussed below, Defendants' factual statements, even if undisputed, do not

27   provide a basis for granting their Motion.  Most of their "facts" are not really facts at all but

28   inferences and suppositions.  Stripped of its inferences, suppositions and rhetoric, their

1  Motion does not provide any facts to support their affirmative defenses.  Instead, it provides

2  a solid basis for this Court to grant summary judgment for the Secretary.

3  ## II.  STATEMENT OF FACTS

4  ### A.   The Secretary's Case Against Defendants

5  As explained in the Secretary's Motion for Partial Summary Judgment ("Sec. Mot."),

6  and supporting Declarations of Karl Spargur ("Spargur Decl."), Kathryn Kerkhoff

7  ("Kerkhoff Decl.") and Megan Guenther ("Guenther Decl."), filed on January 31, 2007, all

8  of which are incorporated herein by this reference, the Secretary has incontrovertible proof

9  of Defendants' abrogation of their fiduciary responsibilities.  Documents created and

10  maintained by Sullivan, the plan administrator, establish that beginning in the mid-1990s,

11  more than $76 million was siphoned from the ERISA Plans, over $50.5 million of which

12  was transferred to the Convalescent Fund, purportedly to prop up Konocti.  Sec. Mot. at 5,

13  Kerkhoff Decl. ¶¶ 12-35 and Exhs. cited therein.  Notably, these figures are supported by

14  the report of Defendants' own expert, who measured the cash transfers the same way.

15  Kerkhoff Decl. ¶¶ 35, 58-59, Exhs. 210, 237.

16  Defendants did not and could not produce any documents to show that the

17  fiduciaries acted prudently in exercising their responsibilities.  Sec. Mot. at 8-10, Spargur

18  Decl. ¶¶ 10,41, 43, 47-49, 74-79, 81 and Exhs. cited therein, Guenther Decl. ¶¶ 14-16 and

19  Exhs. cited therein.  They do not have a shred of evidence to indicate that they conducted a

20  prudent investigation or ever took steps to protect the assets of the ERISA Plans before

21  turning them over to the Convalescent Fund.  Sec. Mot. at 8-10 and Decls. and Exhs. cited

22  therein.  While most of the fiduciaries were inexcusably ignorant of the ERISA assets

23  flowing to the Convalescent Fund, Mazzola Sr. and Sullivan caused and permitted the

24  transfers to occur without regard to whether they represented a prudent investment for the

25  Plans.  Sec. Mot. at 8, Spargur Decl. ¶¶ 29-30, 34-35, 74-79, 81 and Exhs. cited therein,

26  Guenther Decl. ¶¶ 6-9, 25 and Exhs. cited therein.  In deposition after deposition, the

27  trustees showed lack of vigilance about the Plans' financial condition, professed ignorance

28  about the cash transfers and admitted that even after they found out about them, they did

nothing.  Sec. Mot. at 8, Guenther Decl. ¶¶ 4-24 and Exhs. cited therein.  There are no security agreements, ownership documents, or any legally enforceable document evidencing the Plans' right to payment.  Sec. Mot. at 9, Spargur Decl. ¶¶ 41, 43, 47-48, 81 and Exhs. cited therein.  The Plans have not earned any return -- and will earn none in the future -- on the more than $50.5 million that Defendants permitted to be transferred from the Plans to the Convalescent Fund. Sec. Mot. at 7-8, Decls. and Exhs. cited therein.

Before the current investigation, the Secretary did not know that the fiduciaries had made transfers in violation of ERISA, that the fiduciaries were imprudently diverting cash to the Convalescent Fund, that the trustees were generally ignorant of those transfers, that the trustees exercised no oversight over Sullivan, that there were no promissory notes or collateral to protect the Plans' interests with respect to the diversions of cash, that the Convalescent Fund's financial condition was poor or that Konocti suffered recurring losses. Spargur Decl. ¶¶ 8, 30, 31, 34, 36, 38, 39, 41-44, 57, 65, 66.

In addition to the imprudent and disloyal cash transfers that benefited the Convalescent Fund, the fiduciaries acted to benefit Local 38, as well as the Convalescent Fund, in a series of transactions involving Imperial Bank in September 2000, as set forth in the Secretary's Fourth Claim.  As the Secretary learned in discovery, the September 2000 loans were the culmination of a long-standing lending relationship between the Convalescent Fund and Imperial Bank that began as early as October 1990.  Sec. Mot. at 13, Guenther Decl. ¶ 32, Exh. 120.  The default leading up to the September 2000 loans actually occurred in 1993, precipitating a foreclosure proceeding by the Bank on April 5, 1993, and resulting in a Stipulated Permanent Injunction resolving the foreclosure action on November 8, 1993 against not only the Convalescent Fund, but also the Pension Plan and Health & Welfare Plan, although neither were obligors on the loans.  Sec. Mot. at 13, Guenther Decl. ¶¶ 30-33, Exhs. 119-121.  The injunction restrained all three Funds from encumbering or selling Konocti without Imperial Bank's written consent and required them to pay monthly payments to the Bank.  Sec. Mot. at 13, Guenther Decl. ¶ 33, Exh. 121.  The stipulated injunction, as amended, continued in force through September 2000, although the

1  amended injunctions in 1997 and 2000 removed the Pension Plan and the Health & Welfare
2  Plan from their terms.  Sec. Mot. at 13, Guenther Decl. ¶¶ 34-37, Exhs. 122-125.

3          Konocti's value, as of September 2000, was $4 million.  Declaration of Megan
4  Guenther in Support of Secretary of Labor's Opposition to Defendants' Motion for
5  Summary Judgment ("Guenther Decl. ISO Opp'n") ¶ 12, Exh. 310.  On September 27, 2000,
6  Local 38, through Mazzola Sr., borrowed $6 million from Imperial Bank at 9.5 percent.
7  Sec. Mot. at 13-14.  Two days later, Local 38 loaned $6 million to the Convalescent Fund,
8  at 12 percent, and received a deed of trust on Konocti.  Sec. Mot. at 13, Guenther Decl. ¶¶
9  40-41, Exhs. 128-129.  The Convalescent Fund used the proceeds of the Local 38 loan to
10  satisfy Imperial Bank's loan.  Sec. Mot. at 13.  While the interest rate on the note to the
11  Union remained at 12 percent, Local 38 had negotiated and lowered its interest rate to 7.5
12  and then 8 percent.  Sec. Mot. at 13-14, Guenther Decl. ¶¶ 42, 45, Exhs. 130 at 10 n.3, 133.
13  Thus, through these machinations, the Convalescent Fund preserved its ownership of a $4
14  million property by borrowing $6 million and using ERISA Plan funds to make the debt
15  payments.  Local 38, the party in interest, benefited from the interest point spread.

16          The Convalescent Fund's financial statements clearly show that it received cash
17  transfers from the ERISA Plans, and that it did not have enough funding from sources other
18  than the ERISA Plans to cover its operating expenses and its debt payments to Local 38 on
19  the loan.  Guenther Decl. ISO Opp'n ¶¶ 13-14, Exh. 311 at MZLA 216892, Exh. 312 at
20  MZLA 143766.  Therefore, the transfers of ERISA Plan assets made possible the payments
21  on the loan from Local 38.  Guenther Decl. ISO Opp'n ¶ 15, Exh. 313 at 8-9, 12 and Table
22  5.  No other conclusion is possible.

23          **B.      Plan Administration and Fiduciaries' Duties**

24          Local 38 established the ERISA Plans and the Convalescent Fund through collective
25  bargaining agreements ("CBAs").  Sec. Mot. at 10, Spargur Decl. ¶ 14, Exh. 21.  All Local
26  38 Trusts were governed by the CBAs and trust agreements.  Sec. Mot. at 10-11, Spargur
27  Decl. ¶ 23, Exh. 26.  The trust agreements were, for the most part, identical and contained
28  terms that paralleled the fiduciary and prohibited transaction sections of ERISA §§ 404 and

1   406.  Sec. Mot. at 11, Spargur Decl. ¶ 23, Exh. 26.  Thus, while the CBAs permitted the

2   trustees to establish an Administration Office, appoint an Administrator for the Plans, and

3   reallocate employer contributions, the trust agreements required the trustees to do so in

4   compliance with the terms of the trust agreements and ERISA.  Sec. Mot. at 11, Spargur

5   Decl. ¶ 23, Exh. 26.

6        C.      The *Mazzola I* Litigation

7        Defendants' argument largely is based on the Secretary's purported knowledge of

8   their "system of interfund transfers," reallocation of employer contributions in Mazzola I,

9   and some interfund transfers.[3]  Defs. Mot, at 8.  Mazzola I, however, was not a case about

10  an accounting system, employer contributions, or cash transfers, and neither is the current

11  case.  Defendants offer no facts, and none exist, to establish that the Secretary investigated

12  or gained actual knowledge about whether they used the interfund transfer system or

13  reallocation of employer contributions to conceal imprudent transfers of ERISA plan assets

14  during Mazzola I.  The significance of Mazzola I is not what the Secretary knew, but what

15  the Defendants should have learned about their fiduciary duties.

16        In Mazzola I, the Secretary sued the then-trustees of the Pension Fund, which

17  included Mazzola Sr., Buckley, and Kazarian, who are defendants in the current action, for

18  violating their duties of prudence, diversification and loyalty in causing the Pension Plan to

19  make one loan, give a loan repayment moratorium and extend the due date of another loan

20  to the Convalescent Fund.  The loans were secured by Konocti.  The Secretary also sued the

21  fiduciaries for making an imprudent loan from the Pension Plan to S&F Spas and a

22  $250,000 payment by the Pension Plan for a feasibility study of Konocti.  1981 U.S. Dist.

23  LEXIS 17411 at *2; aff'd 716 F.2d at 1228.

24

25  _____

26  [3]  Defendants identify only one interfund transfer other than the Health & Welfare advances
    discussed earlier.  That was a single transfer of $338,500 in Vacation Plan funds in 1974.

27  Def. Mot. Wallace Decl., Exhs. 8 and 10.  Unlike the undocumented, unauthorized
    diversions in this case, it was a one time transfer authorized by the Board of Trustees.  Id. at

28  Exh. 8.  Moreover, there is no evidence that the transfer was imprudent or that the Secretary
    investigated it to determine whether it was imprudent.

1    The <u>Mazzola I</u> court found that the trustees had been imprudent in making the loans

2    and extensions of credit, failed to diversify Plan assets, acted on both sides of the

3    transactions, and "consistently transacted business with and for the Convalescent Fund at all

4    relevant times for the purpose of aiding the Convalescent Fund at the expense of the

5    Pension Fund."  1981 U.S. Dist. LEXIS 17411 at *58-60, 67 ¶¶ 10-13, 24.  As relief in

6    <u>Mazzola I</u>, in addition to restitution, the Court ordered the appointment of an independent

7    investment manager with exclusive power and control over Pension Fund assets. 1982 U.S.

8    Dist. LEXIS 18412 at *4.  The independent investment manager served from approximately

9    May 1983 to May 1993.  Apparently, ten years was not long enough.  Once the court-

10   appointed fiduciary stepped down, Sullivan and Mazzola Sr. thought of another way to get

11   money from the Plans – instead of documented, secured loans, they siphoned cash from the

12   Plans' accounts to finance Konocti without any investigation or analysis.  Remarkably,

13   despite the experience of the <u>Mazzola I</u> litigation, several court opinions setting forth

14   fiduciary obligations, and the appointment of the independent fiduciary, Defendants appear

15   not to have gained any understanding of their fiduciary duties and to whom they owe their

16   loyalty.

17   In 1997, the parties in <u>Mazzola I</u> entered into a consent decree resolving all issues in

18   that case.  At that time, the Secretary did not review any Forms 5500 for the Pension Plan

19   for 1992 through 1996, and no investigation was opened.  Guenther Decl. ISO Opp'n., ¶ 19,

20   Exh. 317, RFAs 44, 54.

21   **D.    <u>Subsequent Investigations</u>**

22   In the years following the court's 1983 appointment of the Pension Plan's investment

23   manager, the Secretary conducted the following investigations relating to the Local 38

24   ERISA Plans and the Convalescent Fund, all of which are documented in Reports of

25   Investigation:

26   1.    A 1983 investigation of the Pension Plan concerning loans to third parties, a
27         loan in connection with the Aladdin Hotel in Las Vegas, and purchases of real estate
         in San Francisco (Guenther Decl. ISO Opp'n ¶ 2, Exh. 301);

28

2.      A 1984 investigation of the Convalescent Fund concerning refinancing efforts between it and a commercial lender (Guenther Decl. ISO Opp'n ¶ 3, Exh. 302);

3.      A 1984 investigation of any improper payments by the Plans of attorneys' fees and litigation expenses in <u>Mazzola I</u> (Guenther Decl. ISO Opp'n ¶ 4, Exh. 303);

4.      A 1989 investigation of the Pension Plan's foreclosure on the S & F Spas property, subsequent sale of the property to Fountainhead with financing from the Pension Plan, and the Pension Plan's modification of the loan and extension of additional sums to Fountainhead (Guenther Decl. ISO Opp'n ¶ 5, Exh. 304);

5.      1989 investigations of the Health & Welfare Plan and the Convalescent Fund about reallocations of employer contributions, annual transfers of "excess" Health & Welfare funds (net income less $10,000) to the Convalescent Fund, and "advances" made during the year in anticipation of the end of the year "excess" funds during the period from 1984 to 1987 (Guenther Decl. ISO Opp'n ¶¶ 6-7, Exhs. 306-306); and

6.      A 1993 investigation of the Pension Plan's consideration of financing a San Francisco baseball stadium, which was closed because the financing never took place (Guenther Decl. ISO Opp'n ¶ 8, Exh. 307).

The Reports of Investigation in the 1980s and 1990s contain no indication that the Secretary investigated or discovered any transfers of funds from the Pension Plan accounts to the Convalescent Fund accounts.  <u>See</u> Guenther Decl. ISO Opp'n ¶¶ 2, 5, 8, Exhs. 301, 304, 307.  The Reports also make no mention of loans, extensions of credit or transfers from the Vacation, Apprenticeship or Scholarship Trusts to the Convalescent Fund.  <u>See</u> Guenther Decl. ISO Opp'n ¶¶ 2, 5, 8, Exhs. 301, 304, 307.

As for the 1989 Health & Welfare Plan and Convalescent Fund investigations, the Secretary concluded that the reallocations of employer contributions did not constitute ERISA violations, but the advances of "excess" funds from the Health & Welfare Plan did violate ERISA.  Guenther Decl ISO Opp'n ¶ 9, Exh. 308.  However, Plan administrator Sullivan represented to the Secretary that the Convalescent Fund had obtained a loan to repay the advanced amounts.  <u>Id.</u>  It is undisputed that, as of March 15, 1990, the Secretary believed that the Convalescent Fund had repaid all advanced amounts and that the practice of advancing funds from the Health & Welfare Plan to the Convalescent Fund had stopped.

Guenther Decl ISO Opp'n ¶ 9, Exh. 308 at Mazz 3718.  This belief was memorialized in a memorandum prepared at the time, and the Secretary closed her investigation. Id.

The absence of any findings of imprudent cash transfers, except for Health & Welfare Plan advances which the Secretary believed had been discontinued, is consistent with the Forms 5500s and financial statements throughout the 1980s and up to 1995, which reflected no cash transfers from any Plans other than Health & Welfare to the Convalescent Fund.  Sec. Mot. at 7, Kerkhoff Decl., ¶¶ 49, 51-52 and Exhs. cited therein.  None of those Forms 5500 and financial statements contained any indication that repayment of any Receivable depended on the operations of the Convalescent Fund.  Kerkhoff Decl. ¶¶ 51-53, Exhs. 232-235.  It was not until plan year ending June 30, 1995, that the Pension, Vacation, Apprenticeship or Scholarship Plans' financial statements first began to reflect the transfers, which were included within the Receivables asset item.  Kerkhoff Decl. ¶¶ 51-53, Exhs. 232-235.  Further, the presence of the independent investment manager from 1983 to 1993 would have prevented the transfers because the independent investment manager had exclusive authority and control over all of the Pension Plan's assets.  See Mazzola, 1982 U.S. Dist. LEXIS 18412 at *4.  Between the closing of the 1989 investigations and the opening of the February 2000 investigation, the Secretary conducted no other investigations of the Local 38 Trusts.  Guenther Decl. ISO Opp'n ¶ 19, Exh. 317, RFA 5.

### E.   The Secretary's 2000 Investigation and Tolling Agreements

The IRS made a referral to the Secretary on November 4, 1999, of possible ERISA violations with respect to the Pension Plan.  Defs. Mot. at 16.  According to the IRS' notes from a meeting with Sullivan on September 9, 1999, Sullivan discussed the increase in the Receivable, that the increase paralleled the capital improvements to Konocti, and that the Receivable had not been paid.  Guenther Decl. ISO Opp'n ¶ 17, Exh. 315.  Sullivan reported that the Pension Plan's investment manager was not involved in the transactions, and the IRS investigator mused, "Where were the projections on Konocti and who was making the decisions and on what basis?"  Id.  The IRS investigator did not answer those questions.

Instead, they were left to the Secretary to investigate, and as part of the referral, the IRS

posed three areas of inquiry for the Secretary to investigate:

> Was it prudent for the Trustees to invest pension funds in Konocti.
> Was it prudent for the Trustees to extend loan money to Konocti without security.
> Was there proper diversification of assets.

Id. Shortly thereafter, in February 2000, the Secretary began the investigation that led to

this lawsuit. Spargur Decl. ¶¶ 3-4. After the investigation opened, through a series of

separate agreements, dated September 18, 2001, October 21, 2002, October 25, 2002, and

November 26, 2003, the Secretary, the Trustee Defendants and Sullivan tolled the running

of the statute of limitations as of September 18, 2001. Spargur Decl. ¶ 7, Exhs. 5-8. The

November 26, 2003 agreement consolidated the separate tolling agreements into a single

extension agreement, tolled the statute of limitations as of September 18, 2001, and required

the Trustee Defendants and Sullivan to stop making further transfers of ERISA Plan funds

to the Convalescent Fund. Id. As of September 18, 2001, the Secretary was still

investigating the issues and did not have knowledge that any ERISA violations had

occurred. Spargur Decl. ¶ 8.

In October 2002, the Secretary informed Defendants of her concerns about ERISA

violations in connection with the imprudent transfers. Guenther Decl. ISO Opp'n ¶ 18, Exh.

316. Defendants nonetheless continued to make the transfers until finally agreeing to stop

in November 2003. Spargur Decl., ¶ 7.

The Secretary did not enter into tolling agreements with the ERISA Plans or R.L.

Milsner because she has no claims against them; with respect to the Plans, any relief the

Secretary obtains will be on their behalf. She also did not enter into a tolling agreement

with Local 38 and Lakeside Haven. This simply means that the Secretary can seek to

recover for claims as of November 21, 1998, six years before the filing of her complaint

because she did not have actual knowledge more than three years before she filed her

complaint.

/ / /

/ / /

### III.  ARGUMENT

#### A.    **Defendants' Burden of Proof**

To prevail on their Motion, Defendants bear the burden of establishing that there is "no genuine issue of material fact" and that Defendants are thus entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Chao v. Hall Holding, Inc., 285 F.3d 415, 424 (6th Cir. 2002); Nat'l Bank of Alaska, 828 F. Supp. at 1430 (declining to grant summary judgment where defendants failed to establish that the Secretary had actual knowledge of ERISA violation more than three years before bringing suit).  Material facts are those necessary or relevant to an element of a claim or defense whose existence may affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is considered "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Id.

Defendants have failed to meet their burden to establish that the Secretary knew all the material facts of the elements of her current claims prior to September 18, 1998.  They fail to show that the Secretary knew that the fiduciaries were imprudently diverting cash to the Convalescent Fund, that the trustees were generally ignorant of those transfers, that the trustees exercised no oversight over plan administration, that there were no promissory notes or collateral to protect the Plans' interests with respect to the diversions of cash, that the Convalescent Fund's financial condition was poor or that Konocti suffered recurring losses.  Indeed, the material facts establish the opposite – that before the February 2000 investigation, the Secretary did not have knowledge of the transfers at issue.  Spargur Decl., ¶¶ 8, 30, 31, 34, 36, 38, 39, 41-44, 57, 65, 66.

The facts Defendants do present, even if undisputed, are not material and do not provide a basis for granting their Motion.  Defendants' facts in support of their various theories are as follows:  The Secretary learned about their interfund accounting system and about some interfund transfers in Mazzola I; after opening an investigation in 1989, the Secretary closed the investigation because she believed that they had paid money back and learned the errors of their ways; the Secretary received a referral from the IRS in November

1   1999; and the Trustee Defendants did not receive a letter from the Secretary stating that

2   they had been violating the law.  None of these facts, even if undisputed, provides a basis

3   on which to grant Defendants' Motion.

4       **B.    Defendants Cannot Establish that the Secretary is Barred by the**
        **Actual Knowledge Prong of ERISA's Statute of  Limitations**

5

6           Under ERISA § 413, the Secretary's claims for breach of fiduciary duty must be

7   brought within the earlier of (1) six years from the date of the last action constituting part of

8   the breach or (2) three years from the earliest date on which the Secretary had actual

9   knowledge of the breach.  29 U.S.C. § 1113; Waller v. Blue Cross of California, 32 F.3d

10  1337, 1341 (9th Cir. 1994).  Actual knowledge for purposes of ERISA § 413 is knowledge

11  of the material facts of the breach or violation.  Blanton v. Anzalon, 760 F.2d 989, 991-92

12  (9th Cir. 1985); see, e.g., Waller, 32 F.3d at 1341 ("disclosure of a transaction that is not

13  inherently a breach cannot communicate the existence of the underlying breach"); Brock v.

14  Nellis, 809 F.2d 753, 754 (11th Cir. 1987) (finding Secretary's claim not barred where

15  Secretary knew of transaction but not of defendants' involvement in transaction more than

16  three years before filing suit).

17          "Actual knowledge requires more than a suspicion 'that something was awry.'"  Pac.

18  Lumber Co., No. C-91-1812 SBA, 1993 WL 832744, at *2, quoting Brock, 809 F.3d at 755.

19  Moreover, constructive knowledge -- "knowledge of facts sufficient to prompt an inquiry

20  which would have uncovered the breach" -- is not actual knowledge under ERISA § 413.

21  Pac. Lumber Co., 1993 WL 832744 at * 2, citing Gluck v. Unisys Corp., 960 F.2d 1168,

22  1176 (3d Cir. 1992).  Rather, the Secretary must have actual knowledge of every element of

23  the charged violation and the opportunity to perform an independent, substantive

24  examination of the facts and circumstances . . . and to assess the validity of the allegations.

25  Pac. Lumber Co., 1993 WL 832744 at * 2-3 (declining to charge Secretary with actual

26  knowledge that plan had used imprudent process to select annuity provider where

27  Department investigators knew only that annuities had been purchased, had read newspaper

28

1    articles, and talked to Congressional investigators about the charged violations); accord

2    Reich v. Lancaster, 55 F.3d 1034, 1059 (5th Cir. 1995).

3          To prevail on their statute of limitations affirmative defenses, Defendants must show

4    that the Secretary knew all of the material elements of her claims more than three years

5    before entering into tolling agreements or filing suit.  Defendants must show not only that

6    the Secretary had actual knowledge of the transfers of ERISA Plan assets that took place in

7    the 1990s, but also that the Secretary knew the material circumstances of these transfers.

8    Defendants fail on both counts.  The Secretary did not have actual knowledge of the

9    violation before September 17, 1998, which is three years before the September 18, 2001

10    effective date of the Secretary's tolling agreement with the Trustee Defendants and Sullivan.

11    As discussed below, none of the facts learned in previous investigations provided actual

12    knowledge of the imprudent cash transfers at issue here.  In addition, the Secretary could

13    not have known then of the basis for her claims in this suit because the transfers had not yet

14    occurred.

15       **C.**      **There is No Evidence that the Secretary Obtained Actual Knowledge of**

16              **Imprudent Cash Transfers in *Mazzola I***

17          Defendants claim that this suit is barred because in Mazzola I the Secretary litigated

18    specific loans from the Pension Plan to the Convalescent Fund and did not challenge the

19    interfund accounting system. Defs. Mot. at 20.  Defendants miss the point.  Neither

20    Mazzola I nor this case is about a system of interfund accounting.  The Secretary has not

21    investigated whether the interfund accounting system, or its use to account for the common

22    administrative expenses of the ERISA Plans, violated ERISA.  While Defendants present

23    facts that the Secretary knew about the accounting system's existence, they present no facts

24    that the Secretary knew of the system's abuse as a means to imprudently allow a massive

25    cash drain from the very ERISA Plans whose assets they were supposed to protect.  Here, it

26    was not until after she began the February 2000 investigation that she uncovered the

27    fiduciaries' imprudence.  Thus, Defendants' facts simply do not establish her knowledge in

28    Mazzola I of fiduciary breaches relating to the transfers at issue in this case.

1      Defendants state that the Secretary knew in <u>Mazzola I</u> about reallocations of

2   employer contributions to the Health & Welfare Plan and advances of Health & Welfare

3   Plan assets.  Defs' Mot. at 14, 20.  This is much ado about nothing.  The Secretary did not

4   allege in <u>Mazzola I</u> and does not allege in this action that the reallocation of employer

5   contributions before they become plan assets constitutes an ERISA violation.[4]  Moreover,

6   the fact that the fiduciaries believed that they had the authority to reallocate employer

7   contributions, the fact that they made such reallocations or the fact that transfers were made

8   between plans would not necessarily telegraph the existence of a fiduciary breach under

9   ERISA because making reallocations or transfers were subject to the terms of the trust

10  agreements, which required the fiduciaries to act prudently and loyally to the respective

11  ERISA Plan.  Defendants proffer no facts that the fiduciaries were making cash transfers in

12  a manner inconsistent with the trust agreements or ERISA and that the Secretary had

13  knowledge of those breaches.[5]  In the absence of those facts, Defendants cannot support

14  their statute of limitations defense.

15      Defendants also take the Secretary to task for not shutting down Konocti; they

16  overlook the fact that Konocti is not owned by any ERISA Plan over which the Secretary

17

18  _____

    [4]  The Secretary explained in her interrogatory answers the distinction between the
19  reallocation of employer contributions and transfers of plan assets.  Guenther Decl. ISO
    Opp'n ¶ 19, Exh. 317, RFAs 2, 5.  Reallocation of employer contributions does not
20  necessarily violate ERISA.  Employer contributions generally do not become plan assets
    until they are deposited into a plan.  <u>Cline v. Indus. Maint. Eng'g & Contracting Co.</u>, 200
21  F.3d 1223, 1234 (9th Cir. 2000) (citing cases); <u>Local Union 2134, United Mine Workers v.</u>
    <u>Powhatan Fuel</u>, 828 F.2d 710, 714 (11th Cir. 1987).  Thus, the Health & Welfare
22  reallocations of employer contributions in <u>Mazzola I</u>, made before the money was deposited
    into the Plan's account, did not necessarily constitute an ERISA violation.
23

24  [5]  Defendants also state that as far back as <u>Mazzola I</u>, the Secretary has believed that Local
    38 controls the Convalescent Fund and its trustee. Defs. Mot. at 13.  This fact has no
25  bearing on any affirmative defense in this case, which involves the diversions of $50.5
    million in ERISA Plan assets to the Convalescent Fund and to Konocti from October 1995
26  through 2004.  Defendants also argue that the Secretary's claims should be barred because
    she knew in <u>Mazzola I</u> and in the 1980s that Konocti was unprofitable.  This fact, alone, is
27  of no consequence without the additional fact -- discovered in the February 2000
    investigation -- that the fiduciaries were financing it with ERISA plan money.
28

1    has jurisdiction.  Similarly, Defendants' argument that the Secretary should have known

2    from the Forms 5500 filed by the Convalescent Fund that it was receiving funding from

3    ERISA Plans is immaterial.  First, the Convalescent Fund is not an ERISA-covered entity

4    and, secondly, its receipt of ERISA assets is not a per se ERISA fiduciary breach.  These

5    facts did not signify a problem until the Secretary learned, during her February 2000

6    investigation, that the Convalescent Fund's receipt of ERISA assets was the result of

7    imprudent and disloyal conduct on the part of the ERISA Plan fiduciaries. This hodgepodge

8    of facts in Defendants' motion does nothing to support their defenses.

9          The simple truth is that during Mazzola I, no evidence surfaced of imprudent and

10   disloyal transfers from the Pension Plan to the Convalescent Fund other than the

11   documented loans.  In contrast to Mazzola I, Defendants in this case did not even document

12   the transfers of funds as loans; instead, they simply poured more than $50.5 million in cash

13   from the ERISA Plans and recorded the expenditures as "Receivables" in the ERISA Plans'

14   financial statements and annual reports.  None of the amounts has ever been paid back, and

15   the Plans have not received any interest payments.  Accordingly, because Defendants'

16   motion presents no facts that existed or of which the Secretary had actual knowledge during

17   Mazzola I of imprudent cash transfers, they have not met their burden of proof for this

18   defense and are not entitled to summary judgment.  Instead, summary judgment should be

19   entered in the Secretary's favor because the facts establish that she did not have actual

20   knowledge.

21          **D.      There is No Evidence that the Secretary Obtained Actual Knowledge
22                    as a Result of Investigations in the 1980s and 1990s**

23          With the exceptions of the 1989 Health and Welfare Trust and Convalescent Fund

24   investigations, none of the Secretary's investigations in the 1980s and 1990s had anything

25   whatsoever to do with any imprudent transfers of assets from the ERISA Plans to the

26   Convalescent Fund.  The 1983 investigations involved real estate purchases and loans, and

27   the 1984 investigation was an inquiry into the improper payment of Mazzola I attorneys'

28   fees and litigation expenses. See discussion, supra, at 10-12.  The 1989 Pension Plan

1    investigation focused on loans which had been the subject of <u>Mazzola I</u>.  As part of that

2    investigation, the Secretary reviewed the Pension Plan's financial statements for plan year

3    ending June 30, 1987.  That financial statement contained none of the indicia of transfers to

4    the Convalescent Fund present in the post-1995 financial statements.  As of that year, the

5    Pension Plan's receivable from Administration was under $130,000 or 0.18 % of plan

6    assets.  The notes to the financial statements indicated that the receivable represented funds

7    spent on administrative expenses common to the Local 38 Trusts and there was no mention

8    that repayment of the receivable depended on the operations of the Convalescent Fund.  <u>See</u>

9    Kerkhoff Decl. ¶¶ 49, 51-53, Exh. 227, 232.

10         Had imprudent transfers between the Pension Plan and the Convalescent Fund been

11   uncovered in the 1989 Pension Plan investigation, they would have been featured

12   prominently in the Report of Investigation since the Secretary's primary concern in a

13   contemporaneous investigation was the transfer of funds from the Health & Welfare Plan

14   account to the Convalescent Fund.  <u>See</u> Guenther Decl. ISO Opp'n, ¶¶ 6-7, Exh. 305-306.

15   The 1989 Health & Welfare Plan and Convalescent Fund investigations revealed that

16   between 1984 and 1987, the Health & Welfare Plan had transferred funds from its savings

17   account to the Convalescent Fund.  Like the transfers at issue in this litigation, there was no

18   security or loan documentation for the transfers.  After these transfers came to light, the

19   Secretary closed her investigation because she believed that the Convalescent Fund had

20   repaid the transferred amounts and that the trustees had ended the practice of making such

21   transfers from the Health & Welfare Plan.

22         The Secretary's most recent Pension Plan investigation prior to 2000 occurred in

23   1993.  That investigation involved the possible financing of the San Francisco baseball

24   stadium.  Guenther Decl. ISO Opp'n ¶ 8, Exh. 307.  As with the earlier investigation, there

25   was no indication of any transfers from the Pension Plan through the Administration

26   checking account to the Convalescent Fund.  <u>Id</u>.

27         In sum, there is no indication in any of the Secretary's Reports of Investigation that

28   she knew of diversions of plan assets from any plans other than the Health and Welfare

1   Plan. There is no dispute that as of 1990 the Secretary believed that transfers from the

2   Health & Welfare Plan had stopped.  Guenther Decl. ISO Opp'n ¶9, Exh. 308.  The fact that

3   she was mistaken in her belief that the money had been paid back and the transfers

4   discontinued does not prove Defendants' affirmative defenses.  If anything, it shows that

5   rather than discontinue the transfers, the Defendants concealed their intentions, misled the

6   Secretary and continued to violate the law.  Nor did the financial statements of the Pension,

7   Apprenticeship, Vacation or Scholarship Plans contain any of the post-1995 indicia of the

8   transfers.  The financial statements of those plans throughout the 1970s, 1980s, and through

9   1995 included no mention that repayment of those receivables depended on the operations

10  of the Convalescent Fund.  See Kerkhoff Decl. ¶¶ 47-53, Exhs. 227-235.  Finally, there is

11  no dispute that the Secretary had no knowledge about the transfers from 1994 to February

12  2000 as she conducted no investigations and reviewed no Local 38 ERISA Plan financial

13  statements during those years.  Guenther Decl. ISO Opp'n ¶ 19, Exh. 317, RFA 5.

14   **E.      There is No Evidence that the Secretary Obtained Actual Knowledge**
15   **as a Result of the IRS Referral**

16          The Secretary and Sullivan executed an agreement tolling the statute of limitations

17  on October 21, 2002.  Spargur Decl. ¶ 7, Exh. 6.  On November 26, 2003, the parties signed

18  another tolling agreement in which Sullivan agreed to toll the statute as of September 18,

19  2001 (the same date as the Trustee Defendants) and the Secretary agreed to forbear from

20  suing. Spargur, ¶ 7, Exh. 8.  In order to bar any of the Secretary's claims against Sullivan,

21  Defendants must show that the Secretary had actual knowledge regarding Sullivan's

22  violations prior to September 17, 1998.  Since the IRS referral to the Secretary was not

23  made until November 4, 1999, there is no basis for finding that any of the claims against

24  Sullivan are barred by the statute of limitations.  Even assuming that the operative tolling

25  date for Sullivan is October 21, 2002, Defendants cannot succeed because the Secretary did

26  not have actual knowledge of fiduciary breaches three years before that date, or by October

27  20, 1999.  Defendants' reference to the beginning of the IRS audit in December 1998 is not

28

material because neither the Secretary nor the IRS had any knowledge of ERISA violations at the very outset of the IRS audit.

At the conclusion of the IRS audit, the IRS investigator referred the Pension Plan to the Secretary to investigate three questions:

> Was it prudent for the Trustees to invest pension funds in Konocti.
> Was it prudent for the Trustees to extend loan money to Konocti without security.
> Was there proper diversification of assets.

Guenther Decl. ISO Opp'n ¶ 17, Exh. 315.

Without conducting her own investigation, the Secretary could not answer the IRS's questions, and without the answers to the questions, she could not know whether there were ERISA violations. Thus, the Secretary could not bring suit based simply on the IRS referral. Rather, prior to bringing suit, "it was incumbent upon the DOL to conduct an intensive and thorough investigation of the facts and circumstances . . . and to thus assess the validity of the allegations." Pac. Lumber, 1993 WL 832744 at * 3 (refusing to find that the Secretary gained actual knowledge of ERISA violations by reading newspaper articles and talking to Congressional investigators about the possibility that an imprudent transaction had occurred); see U.S. v. Masons Tenders Dist. Council of Greater New York, 909 F. Supp. 882, 891 (S.D.N.Y. 1995) (DOL investigator's statement to the press that transaction did not show actual knowledge rather the most that could be inferred was that DOL "was alert to the need to conduct an investigation into the transactions"); cf. Fed. R. Civ. P. 11.  "Indeed, it would have been irresponsible for DOL to conclude that a violation had occurred without conducting such an investigation." Pac. Lumber, 1993 WL 832744 at * 3.

Defendants do not cite a single case that stands for the proposition that any knowledge that the IRS gained is imputed to the Secretary.  Indeed, such a rule would fly in the face of established law and could seriously prejudice each agency's enforcement efforts. For that reason, "[g]overnment agencies do not merge into a monolith." Hughes v. United States, 701 F.2d 56, 58 (7th Cir. 1982) (per curiam).  The mere fact that the Secretary and the IRS have a memorandum of understanding that allows them to share information and refer cases that fit within the other's expertise do not make them agents of each other.

1  Instead pursuant to 29 U.S.C. § 1204, the IRS and the Secretary have separate, clearly

2  delineated enforcement jurisdictions, with the Secretary having enforcement authority and

3  expertise with respect to the fiduciary duties contained in Title I of ERISA and the IRS

4  charged with enforcing the tax-related standards of Title II.

5      Furthermore, contrary to Defendants' assertion, neither 26 U.S.C. § 6103(l)(2),

6  which provides that the Secretary of Labor may receive tax return information upon request

7  to aid in the enforcement of ERISA, nor the centralized processing of Forms 5500, creates

8  an agency relationship between the IRS and the Secretary for enforcement purposes.  Given

9  the long list of federal, state and local agencies and private parties empowered to receive tax

10  return information under 26 U.S.C. § 6103, interpreting the provision to buttress a "special

11  relationship" between the Secretary and the IRS approaches the absurd.

12      In sum, the November 1999 referral from the IRS did not give the Secretary actual

13  knowledge of the violations.  The Secretary could not know whether ERISA had been

14  violated until she investigated the facts and was able to answer the IRS' questions.

15
16      **F.    The Statute of Limitations Does Not Bar the Secretary from Enforcing
           ERISA Against the Fiduciaries for Post-1995 Imprudent Transfers**

17      Defendants' statute of limitations defense rests on the astounding proposition that

18  with little bits and pieces of miscellaneous knowledge, bound together by inferences and

19  suppositions, the Secretary must have had actual knowledge of their practice of transferring

20  ERISA Plan assets in the 1970s and 1980s, which knowledge now precludes her from

21  enforcing the fiduciary provisions of ERISA against them for imprudent and disloyal

22  transfers in the 1990s and after.  As set forth above, the Secretary did not have actual

23  knowledge of such transfers in the earlier decades and Defendants present no material facts

24  to the contrary.  Similarly, she could not have had actual knowledge of diversions of plan

25  assets in those years because they had not yet occurred.   In addition, the circumstances

26  giving rise to and necessitating the illicit transfers -- the termination of the independent

27  investment manager and the Convalescent Fund's 1993 default and the Bank's injunctions --

28  did not exist until 1993.

1    Even assuming that the Secretary had knowledge of past imprudent transfers --

2  which she did not -- actual knowledge of a past transaction that violates ERISA is not actual

3  knowledge of a future violation.  See, e.g., Consultants & Adm'rs, 966 F.2d at 1088 (finding

4  Secretary's past knowledge that fiduciaries selected service provider through imprudent

5  bidding process did not bar claims based on future similar use of imprudent selection

6  process); NYSA-ILA Med. & Clinical Servs. Fund v. Catucci, 60 F. Supp. 2d 194, 199

7  (S.D.N.Y. 1999)("The fact that certain claims are time-barred does not render other similar

8  claims time-barred").  Indeed, courts routinely have held that "each time a fiduciary made

9  an improper payment with Fund assets, 'the Fund [was] harmed and a new cause of action

10  arose. . . , regardless of [plaintiff's] prior knowledge that they were occurring." Id.

11  (obligation to pay employer contributions gave rise to a new cause of action for each missed

12  payment), quoting Dole v. Formica, 14 Empl. Ben. Cas. (BNA) 1397, 1406 (N.D. Ohio

13  1991) (finding new claim arose each time fiduciaries paid excessive fees).  These courts

14  have roundly rejected Defendants argument that recurring breaches, such as the recurring

15  diversions of ERISA Plan assets "simply flowed from the [initial breach decision] and did

16  not give rise to new independent wrongs." NYSA-ILA Med. & Clinical Servs. Fund, 60 F.

17  Supp. 2d at 200, quoting Buccino v. Continental Assur. Co., 578 F. Supp. 1518, 1521

18  (S.D.N.Y. 1983) (finding each time fiduciaries made a premium purchase on imprudently

19  acquired insurance policies rather than terminating them the plan was injured anew and

20  statute of limitations began to run anew), accord Gruby v. Brady, 838 F. Supp. 820, 831

21  (S.D.NY. 1993)(finding new statute of limitations began to run each time fiduciaries injured

22  the plan by making excessive benefit payments).

23    In casting the Secretary's past knowledge of past transfers as actual knowledge of

24  future transfers, Defendants rely on a strained reading of Phillips v. Alaska Hotel and

25  Restaurant Employees Pension Fund, 944 F.2d 509, 520-21 (9th Cir. 1991).  In Phillips, the

26  plaintiffs complained that the vesting rules of their pension plan unduly restricted their

27  ability to vest in their benefits and thus violated the Labor Management Relations Act and

28  ERISA.  Id. at 512.  The Ninth Circuit held that although the exclusion rate was unusually

1   high, the plan met its burden of establishing the reasonableness of its vesting provisions.  Id.

2   at 518-19.

3           In dicta, and despite its decision on the merits, the Court discussed the continuing

4   violation theory in the context of the plaintiffs' claims, but did not decide it.  Phillips, 944

5   F.2d at 521.  The Court opined that because the basis of the plaintiffs' claim was the

6   trustees' failure to amend vesting rules, their breaches were all of the same character.  Id. at

7   520.  "Once a plaintiff knew of one breach, an awareness of later breaches would impart

8   nothing materially new."  Id.  Thus, the statute of limitations would begin to run on the

9   earliest date that a plaintiff became aware of the breach, which in Phillips would have been

10  when the plaintiffs became aware of the trustees' failure to relax the vesting provisions.  Id.

11  at 520-21.  However, because of its ruling that the vesting provisions were reasonable, the

12  Court did not reach the issue of whether the plaintiffs' claims were barred by the statute of

13  limitations.[6]  Id. at 521.

14          Defendants assert that the dicta in Phillips bars the Secretary's claims because she

15  knew about their interfund accounting system in Mazzola I.  Defs'. Mot. at 22-24.  As

16  described above, the Secretary is not suing Defendants about their accounting system.  Her

17  suit is about transfers of more than $50.5 million in ERISA Plan assets without any

18  investigation or analysis as to whether the transfers would benefit the ERISA Plans.  Thus,

19  the Secretary's suit is not about an act of omission, as in Phillips, but about a series of acts

20  of commission by Defendants in making each imprudent and disloyal transfer.  Further,

21

22  ─────────────────

23  [6] The Ninth Circuit has not applied Phillips' interpretation of the continuing violation theory
    to any case involving breaches of fiduciary duty.  In Piscotta v. Teledyne Indus. Inc., the

24  only published Ninth Circuit decision to rely on Phillips' interpretation of the actual
    knowledge standard, the court relied on Phillips by analogy to deny benefits where retired

25  health plan participants complained years after a freeze in the level of health benefits that
    failure to revoke the freeze, which resulted in payment of reduced benefits, violated the

26  terms of their plan.  91 F.3d 1326, 1332 (9th Cir. 1996).  Other courts have drawn a
    distinction between the continuing failures to cure alleged ERISA violations at issue in

27  Phillips and Piscotta and repeated transactions that violate ERISA, such as the transfers
    here.  See Consultants & Adm'rs., 966 F.2d at 1088 (distinguishing between "continuing

28  violations" and repeated violations where each act was separately decided upon).

1   Defendants are not shielded by the CBA provision permitting reallocation of employer

2   contributions because the trust agreements required the fiduciaries to manage and

3   administer the Plans in conformity with the fiduciary and prohibited transaction provisions

4   of ERISA §§ 404(a)(1) and 406, 29 U.S.C. §§ 1104(a)(1) and 1106.

5          Thus, knowledge of the interfund accounting system or the CBA provision did not

6   provide knowledge of future illegal reallocations or imprudent transfers.  Indeed, the trust

7   agreements themselves required the reallocations to be done prudently and loyally, and in

8   compliance with ERISA.  Unlike the plaintiffs in Phillips, who were challenging a decision

9   not to change a particular plan provision, the Secretary in this case challenges a series of

10  discrete, imprudent and disloyal transfers of cash from the ERISA Plans.  These transfers

11  were not all of the same character as in Phillips, but instead, represented separate breaches

12  of both the trust agreements and ERISA.  To find otherwise would be to read the prudence

13  and loyalty sections out of ERISA with respect to these Plans.

14         As Phillips explicitly acknowledged, a "continuous series of breaches may allow a

15  plaintiff to argue that a new cause of action accrues with each new breach."  Phillips, 944

16  F.2d at 521, citing Ziegler v. Connecticut Gen. Life Ins. Co., 916 F.2d 548 (9th Cir. 1990).

17  This distinction was echoed by the concurrence in Phillips, which made abundantly clear

18  that the dicta in the majority opinion was not intended to preclude suit in a case such as this

19  one where both the past violation and the current violation are overt acts, each constituting a

20  new breach.  The Phillips concurrence explained "the plaintiffs and the district court have

21  confused the failure to remedy the alleged breach of an obligation with the commission of

22  an alleged second breach, which, as an overt act of its own, recommences the limitations

23  period."  Contrasting the Phillips analysis with the decision in Meagher v. International

24  Assoc. of Machinists & Aerospace Workers, 856 F.2d 1418 (9th Cir. 1988), where each

25  payment in violation of ERISA gave rise to a new statute of limitations, the concurrence

26  explained:

27
28
           [T]he plaintiffs here have identified no series of successive, overt acts.  Rather, they
           challenge the implementation and operation of vesting rules that determine their
           threshold eligibility to receive pension benefits and were in full effect more than six

1
2

years before the commencement of this action and of the operation of which they were certainly fully aware more than three years before commencement of this action.

3   Phillips, 944 F.2d at 522.  Plainly, the Secretary does not challenge the fiduciaries'

4   accounting system or authority to reallocate employer contributions consistent with their

5   legal obligations and the trust agreements.  Rather, she is suing them for a series of illegal,

6   successive, overt actions -- imprudent transfers of ERISA Plan assets -- each of which has

7   triggered a new breach.  Because she did not have actual knowledge of those transfers

8   within three years of the September 18, 2001 tolling agreement, all of her claims are timely.

9          In holding that past knowledge of past violations does not bar future claims based on

10   future violations, courts have recognized that ERISA imposes ongoing duties on plan

11   fiduciaries.  "If knowledge of an ERISA violation barred claims based on similar future

12   conduct, this continuing fiduciary duty [to review plan investments and eliminate imprudent

13   ones] would be severely weakened and fiduciaries would be left free to engage in repeated

14   violations so long as they had once been discovered and not sued."  Consultants & Adm'rs.,

15   966 F.2d at 1088; NYSA-ILA Med. & Clinical Servs. Fund, 60 F. Supp. 2d at 199-200.

16          Here, each time Defendants failed to evaluate the prudence and loyalty of making an

17   unsecured, cash transfer to the Convalescent Fund, the ERISA Plans were harmed anew.

18   To find otherwise would be to sanction Defendants' conduct and leave them permanently

19   free to commit the most egregious future violations of ERISA, at the expense of the Plans'

20   participants and beneficiaries.

21
22

   **G.      Pre-1988 Forms 5500 Do Not Give the Secretary Constructive
             Knowledge of The Post-1995 Diversions of ERISA Plan Assets**

23          Failing to show that the Secretary had actual knowledge, and knowing that no court

24   will require the Secretary to predict the future, Defendants resort to an attempt to resurrect

25   the "constructive knowledge" prong of ERISA § 413, which was repealed by Congress in

26   1987.  Martin v. Murphy, 815 F. Supp. 1451, 1453 (S.D. Fla. 1993).  Defendants allege that

27   information in the Convalescent Fund's Forms 5500 filed with the Secretary prior to

28

1   December 31, 1987 was sufficient to give her constructive knowledge of the facts of the

2   present claims.[7]  Defendants' argument is mistaken, if not disingenuous.

3          Pre-1988 Forms 5500 and financial statements could not alert the Secretary to

4   transactions that would not take place for almost a decade.  See, e.g., Consultants &

5   Adm'rs., 966 F.2d at 1088; NYSA-ILA Med. & Clinical Servs. Fund., 60 F. Supp. 2d at

6   199; Formica, 14 Empl. Benefits Cas. (BNA) at 1406.  In addition, the pre-1987 Forms

7   5500 filed by a non-ERISA entity (the Convalescent Fund) would not even give the

8   Secretary constructive knowledge of any ERISA violations at the time they were filed.

9          Moreover, a non-ERISA entity's disclosure on a Form 5500 of a transaction that is

10  not inherently a breach of ERISA cannot give the Secretary constructive knowledge that a

11  breach has occurred.  Lancaster, 55 F.3d at 1058-59 (ruling that disclosure on a Form 5500

12  of the purchase of whole rather than term life insurance was not sufficient to give the

13  Secretary constructive knowledge that the insurance purchase was imprudent); Fink v. Nat'l

14  Savs. and Trust Co., 772 F.2d 951, 957-58 (D.C. Cir. 1985); Murphy, 815 F. Supp. at 1453.

15  Thus, a payable owed by the Convalescent to a Local 38 Trust does not itself reveal a

16  fiduciary breach.

17         Defendants' efforts to impute knowledge to the Secretary is further eroded by the

18  ERISA Plans' Forms 5500 themselves, which disclosed no transactions that were inherent

19  breaches of fiduciary duty under ERISA.  Prior to 1995, the Forms 5500 reflected only

20  small receivables and payables due from or to Administration.  For example, these

21  receivables constituted less than 1% of the Pension Plan's assets throughout the 1970s and

22  1980s, as compared to the almost 30% of Pension Plan assets tied up in the receivable in

23  2001.  See Kerkhoff Decl. ¶ 47, 49, Exh. 227.  In addition, the pre-1995 Forms 5500s and

24  financial statements contained no indication that repayment of the receivable was dependent

25

26  [7]  Prior to 1987, ERISA § 413 barred actions brought more than three-years from the

27  earliest date "on which a report from which [the plaintiff] could reasonably be expected to
    have obtained knowledge of a breach or violation was filed with the Secretary. . . ."

28  Congress repealed this section with respect to reports filed after December 31, 1987.

on the performance of the Convalescent Fund.  Kerkhoff Decl. ¶ 51-53, Exh. 232.  In fact, the financial statements of the Pension, Vacation, Apprenticeship, and Scholarship Plans made no mention at all that the receivable was in any way connected to the Convalescent Fund.  To the extent that they explained the purpose of the receivable, they stated only that Administration paid common expenses of the Plans, which is not inherently imprudent.  Kerkhoff Decl. ¶ 51-53, Exh. 232-235.  Thus, these financial statements gave no inkling that approximately a decade later massive amounts of ERISA Plan cash would be siphoned through Administration to the Convalescent Fund.

Health & Welfare Plan and Convalescent Fund financial statements prior to 1988 noted the reallocations of employer contributions and transfers of excesses that occurred each year.  The Convalescent Fund's financial statement contained a footnote that stated that it depended on continued financing by affiliated U.A. Local 38 Trust Funds to continue to operate as a going concern.  Wallace Decl. ISO Defs. Mot. ¶ 17, Exh. 18.  This statement could well have meant the reallocations of employer contributions, not the receipt of Plan assets which had been imprudently transferred.  Indeed, the Convalescent Fund financial statement made no mention of funds from any other Local 38 Trust.  Neither the Health & Welfare financial statement nor the Convalescent Fund financial statement said anything about whether the transfers would continue into the future.  Accordingly, these financial statements could not have given the Secretary constructive knowledge of transfers from all five ERISA Plans to the Convalescent Fund that would take place a decade later or of the circumstances of those future transfers.  See, e.g., Lancaster, 55 F.3d at 1058-59; Murphy, 815 F. Supp. at 1453.

### H.   The Court Should Reject the Defendants' Statute of Limitations Arguments Concerning Local 38, the Convalescent Fund, Lakeside Haven, and Rule 19(a) Parties

Defendants argue that all of the Secretary's claims against Local 38, R.L. Milsner and Lakeside Haven are barred because the Secretary did not enter into tolling agreements with them.  They also argue that the Secretary jeopardized her claims by not securing tolling agreements with the Rule 19(a) parties in this case.  These arguments depend on a

1   fundamentally flawed view of ERISA § 413's three and six year statute of limitations and

2   misconstrue the operation of Federal Rule of Civil Procedure Rule 19(a).

3          First, with respect to Local 38 and Lakeside Haven, the absence of a tolling

4   agreement only bars the Secretary from recovering losses that occurred before November

5   21, 1998, six years before she filed suit on November 22, 2004.  As demonstrated in the

6   Secretary's motion for partial summary judgment, Defendants transferred funds from the

7   ERISA Plans through the Administration checking account to the Convalescent Fund from

8   1995 through July 2003.  Each one of these transfers constituted a new transaction that

9   violated ERISA and with its own three and six year statute of limitations.  Meagher, 856

10  F.2d 1418; Consultants & Adm'rs., 966 F.2d at 1088.  Thus, with respect to these

11  Defendants, the Secretary may recover for all losses resulting from transactions that took

12  place after November 21, 1998.  Any other result would leave fiduciaries, such as Local 38,

13  free in perpetuity to loot ERISA Plans in plain derogation of their ongoing duty to prudently

14  manage ERISA Plan assets, as long as the fiduciaries were once discovered and not sued.

15  Consultants & Adm'rs., 966 F.2d at 1088.

16         Second, the ERISA Plans and R.L. Milsner are Rule 19 parties whose presence is

17  necessary in the lawsuit so that complete relief can be accorded among the parties.  Fed. R.

18  Civ. P. 19(a).  The ERISA Plans have been joined, not because the Secretary has a claim

19  against them, but because the Secretary seeks monetary and injunctive relief on their behalf.

20  Likewise, Milsner's presence is necessary as a Rule 19(a) party to effectuate any injunctive

21  relief that the Court may order.  Because the Secretary does not seek any recovery from

22  these parties, she had no need to enter into a tolling agreement with them.

23         **I. The Affirmative Defense of Res Judicata is Baseless**

24         Defendants contend that res judicata bars the Secretary's claims because she should

25  have litigated them in Mazzola I or prior to entering the Mazzola I final consent decree in

26  1997. Defs. Mot. at 28-31.  There is no factual or legal basis for applying the doctrine of res

27  judicata in this action.  Res Judicata bars plaintiffs from bringing suit for claims if there is a

28  prior judgment on the merits in litigation involving the same parties or their privies and the

1    present dispute involves the same claim as the prior litigation.  <u>Hells Canyon Preservation</u>

2    <u>Council v. U.S. Forest Serv.</u>, 403 F.3d  683, 686 (9th Cir. 2005); <u>Central Delta Water</u>

3    <u>Agency v. U.S.</u>, 306 F.3d 938, 952-53 (9th Cir. 2002).

4        The overriding question in determining whether two claims are the same for res

5    judicata purposes is whether the claims arise out of the same transactional nucleus of facts.

6    <u>Hells Canyon Preservation Council</u>, 403 F.3d at 686; <u>Frank v. United Airlines</u>, 216 F.3d

7    845, 851 (9th Cir. 2000).  A claim does not arise out of the same transactional nucleus of

8    facts, nor is it subject to a final judgment on the merits in prior litigation, if the facts giving

9    rise to the present claim had not yet occurred at the time of the prior judgment.  <u>Frank</u>, 216

10   F.3d at 851; <u>Harkins Amusement Enters. v. Harry Nace Co.</u>, 890 F.2d 181, 183 (9th Cir.

11   1989); <u>Durney v. Wavecrest Labs., LLC</u>, 441 F. Supp. 2d 1055, 1063 (N.D. Cal. 2005)(res

12   judicata does not bar claims where the "wrongdoing, even though part of an alleged course

13   of conduct, was temporally distinct").

14       The Secretary's present claims are not the same as any claims she brought or could

15   have brought during <u>Mazzola I</u>.  <u>Mazzola I</u> dealt, in part, with documented, secured loans

16   and extensions of credit by the Pension Fund to the Convalescent Fund.  By contrast, the

17   Secretary's current claims allege that, beginning in the mid-1990s after Defendants regained

18   control of the Pension Plan, they caused or acquiesced in multiple diversions of ERISA

19   Plan assets amounting to more than $50.5 million.  Plainly, the Secretary's current claims

20   could not have been brought in <u>Mazzola I</u> because the transfers had not yet occurred.

21       Defendants' argument that the Secretary should have somehow sought to litigate

22   issues relating to <u>Mazzola I</u> – if any existed –  at the time of the 1997 consent decree is

23   nonsensical.  By 1997, the trial was over and the appeals period had expired years before.

24   There was nothing left to litigate except Defendants' compliance with the judgment.

25   Defendants' accusation that "nothing prevented the Department from seeking to terminate

26   the Convalescent Fund or force the sale of Konocti at any time up until 1997" is surreal –

27   the Secretary had no jurisdiction to do so because the Convalescent Fund is not an ERISA

28   plan and Konocti is not owned by an ERISA plan.  Further, as discovery has made clear, no

1   Forms 5500 were reviewed by the Secretary before entering into the 1997 consent decree

2   and understandably so.  The Pension Plan was just emerging from a ten-year period of

3   being controlled by an independent investment manager.  The Secretary could reasonably

4   believe that the Plan fiduciaries would comply with ERISA.  As the February 2000

5   investigation revealed, however, ten years was not long enough.

6          **J.**       **The Affirmative Defenses of Waiver and Unclean Hands are Specious**

7          Defendants claim that the Secretary somehow lulled them into believing that what

8   they were doing was legal.  Defs. Mot. at 31-32.  This argument strains credulity.  The

9   Department sued the Local 38 trustees in <u>Mazzola I</u> for making documented, secured loans

10  in violation of ERISA because they were imprudent.  From that, they could not possibly

11  have concluded that it would be proper to siphon cash from ERISA Plans with no

12  investigation, no documentation and no security to protect the Plans' interests.  The

13  Secretary investigated the trustees in 1989 and abstained from suing on transfers from the

14  Health & Welfare Plan to the Convalescent Fund only because she believed that the money

15  had been paid back and the transfers had stopped.  In February 2000, the Secretary began

16  investigating the imprudent transfers at issue here and filed suit.  Far from lulling, the

17  Secretary's prior and current lawsuits and investigations demonstrate that she has always

18  intended to enforce the law.

19         Defendants' only argument to the contrary is that the Secretary never told them they

20  were violating the law.  Defs'. Mot. at 31-32.  In October 2002, the Secretary advised

21  Defendants of her concerns with respect to the transfers.  From October 2002 to November

22  2003, Defendants heedlessly continued to imprudently transfer millions of dollars to the

23  Convalescent Fund.  This conduct makes clear that they were not relying on the Secretary to

24  govern their behavior.  Thus, Defendants' equitable defenses are baseless and should be

25  rejected.  The Secretary has never relinquished her authority to enforce ERISA against these

26  or any other breaching fiduciaries.[8]  <u>See</u> <u>Intel Corp. v. Hartford Accident & Indemnity</u>, 952

27  

---

28  [8] Under Title I of ERISA, the Secretary is responsible for regulating over 1 million plans,
     covering an estimated 60 million participants and managing assets in excess of $1.5 trillion.

F.2d 1551, 1559 (9th Cir. 1991) (waiver occurs when "a party intentionally relinquishes a right, or when the party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished"); <u>Schar v. Hartford Life Ins.</u>, 242 F. Supp. 2d 708, 718 (N.D. Cal. 2003); <u>see</u> <u>Chao v. Chermak</u>, No. 1:05CV1935, 2006 WL 3751191, at *4 (N.D. Ohio Dec. 18, 2006)(finding laches, waiver and equitable estoppel not applicable against the Secretary in claim for breach of ERISA fiduciary duty).

Moreover, under the circumstances, a finding that the Secretary waived her claims would be contrary to the public policy underpinning ERISA.  ERISA imposes the highest duties of prudence and loyalty known to law upon fiduciaries of employee benefits plans. <u>Mazzola</u>, 716 F.2d at 1231-32; <u>Bierwirth</u>, 680 F.2d at 272 n.8. These duties include an ongoing duty to evaluate plan investments and eliminate imprudent ones. <u>Consultants & Adm'rs.</u>, 966 F.2d at 1088. Because the fiduciary's duty is a continuing one, a plaintiffs' knowledge of past breaches of fiduciary duty should not waive future claims under ERISA §§ 404 and 406. <u>See</u> <u>Chao v. Chermak</u>, 2006 WL 3751191, at *4; cf. <u>Boekman v. A.G. Edwards</u>, 461 F. Supp. 2d 801, 814-15 (S.D. Ill. 2006) (courts construe ERISA § 410 as barring waivers of prospective claims for breach of fiduciary duty under ERISA); <u>South Carolina Nat'l Bank</u>, 140 F.3d at 1423 (noting that "in suing for ERISA violations, the Secretary seeks not only to recoup plan losses, but also to supervise enforcement of ERISA, to guarantee uniform compliance with ERISA, to expose and deter plan asset mismanagement, to protect federal revenues, to safeguard the enormous amount of assets

---

Due to the enormity of the task that she faces in enforcing the fiduciary duty provisions of ERISA, "the decision to investigate and bring [an ERISA enforcement] suit . . . is committed to the Secretary's discretion." <u>Dillon v. Dole</u>, 11 Empl. Benefits Cas. (BNA) at 2187; <u>cf.</u> <u>Belmontes v. Brown</u>, 414 F.3d 1094, 1126 (9th Cir. 2005); <u>Marshall v. Jerrico, Inc.</u>, 446 U.S. 238, 248 (1980); <u>Paulsen v. CNF, Inc.</u>, C 03-03960, 2006 U.S. Dist. LEXIS 94199 at * 17 (N.D. Cal. Dec. 22, 2006)(finding PBGC has no duty to bring ERISA breach of fiduciary duty suit in each of thousands of instances where it assumes responsibility for a terminated plan). The exercise of prosecutorial discretion is not equivalent to a decision to waive enforcement of future violations of the law. Even if the Secretary had not sued the fiduciaries in the past for violations, that would not bar her from enforcing the law as to future transactions or give the defendants license to ignore the law and drain the assets of all five Local 38 ERISA Plans in perpetuity.

1  and investments funded by ERISA plans, and to assess civil penalties for ERISA

2  violations."); <u>Donovan v. Robbins</u>, 99 F.R.D. 593, 600 (N.D. Ill. 1983); <u>Donovan v.</u>

3  <u>Schmoutey</u>, 592 F. Supp. 1361, 1403 (D. Nev. 1984).

4

5  **K.    There is Sufficient Evidence on the Secretary's Claim Regarding Local 38's Loan to the Convalescent Fund**

6       The Secretary's Fourth Claim for relief alleges that Mazzola Sr., Sullivan and Local

7  38 violated ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), which prohibits a fiduciary

8  from causing an ERISA plan to engage in a transaction that he knows or should know

9  constitutes a direct or indirect transfer of Plan assets for the use or benefit of a party in

10  interest.  Amended Compl.  ¶¶ 40-51.  By enacting ERISA § 406, Congress intended "to

11  make illegal <u>per se</u> the types of transactions which experience had shown entail a high

12  potential for abuse."  <u>Donovan v. Cunningham</u>, 716 F.2d 1455, 1464-65 (5th Cir. 1983).

13  The prohibition against transactions with parties in interest does not depend on a showing of

14  harm to the plan.  <u>Kayes v. Pac. Lumber Co.</u>, 51 F.3d 1449, 1467-68 (9th Cir. 1995).

15  Among the transactions found to violate ERISA § 406(a)(1)(D) are the indirect use of

16  ERISA plan assets to make payments on loans.  <u>Nat'l Bank of Alaska</u>, 828 F. Supp. at 1435.

17       To show a violation of ERISA § 406(a)(1)(D), the Secretary must show that: (1) a

18  fiduciary (2) caused the plan to engage in the transaction at issue, (3) the transaction used

19  plan assets, (4) the use of plan assets is for the benefit of a party in interest, and (5) the

20  fiduciary knew or should have known that elements (3) and (4) were satisfied.  <u>Hall</u>

21  <u>Holding</u>, 285 F.3d at 440.  Undisputed facts exist on all five elements.

22       Defendants cannot dispute that, in his capacity as business manager for Local 38,

23  Mazzola Sr. arranged to have Local 38 borrow $6 million at 9.5% per annum interest for 12

24  years.  Sec. Mot. at 13, 25.  Mazzola Sr., acting both as business manager for Local 38 and,

25  with Sullivan, as an advisor to the Convalescent Fund, then arranged to have Local 38 lend

26  $6 million at 12% per annum interest to the Convalescent Fund.  Sec. Mot. at 13, 25.  In

27  connection with the loan, Local 38 received a first deed of trust on the Konocti property.

28  <u>Id.</u>  The loan allowed the Convalescent Fund to extinguish its debt with Imperial Bank.  <u>Id.</u>

1   The Convalescent Fund was able to make payments on its loan from Local 38 only because

2   of the transfers of ERISA Plan assets to the Convalescent Fund. Sec. Mot. at 25.  Thus,

3   Mazzola Sr., Sullivan and Local 38, all fiduciaries of the ERISA Plans, secured for Local

4   38, a party in interest to the ERISA Plans pursuant to ERISA § 3(14)(A) and (D), a gain of

5   3% interest per annum on the $6 million lent to the Convalescent Fund.

6        Contrary to Defendants' assertions, the ERISA Plans were injured through this

7   transaction in two ways.  First, funds were drained from the ERISA Plans' accounts for debt

8   servicing for Local 38's benefit. Sec. Mot. at 13, 25.  Second, Local 38 was able to secure

9   repayment of the $6 million for itself ahead of any repayment for the over $50.5 million in

10  transfers that the ERISA Plans had made to the Convalescent Fund.  Id.

11       Also, contrary to Defendants assertions, there can be no dispute that ERISA Plan

12  assets made the payments on the loan possible.  While, the monthly debt payments to Local

13  38 were less than the monthly employer contributions, Defendants cannot dispute that

14  employer contributions to the Convalescent Fund were not sufficient to enable it both to

15  make its monthly debt payments and to pay its other expenses.  The Convalescent Fund

16  financial statements clearly demonstrate that without funding from "affiliates," the

17  Convalescent Fund would not have received enough in revenue from Konocti and employer

18  contributions to meet its expenses and its debt payments.  Guenther Decl. in Opp'n, ¶¶ 13-

19  14, Exh. 311-312.   Additionally, contrary to Defendants' assertion, the report of the

20  Secretary's expert, Thomas Lumsden, confirms that ERISA Plan assets were used for

21  repayment of the Convalescent Fund's debt to Local 38.  Guenther Decl. ISO Opp'n ¶¶ 15-

22  16, Exh. 313 at 8-9, 12 and Table 5, Exh. 314, 192:8-193:8.

23       Mazzola Sr., Sullivan and Local 38, as a result of their respective positions, knew or

24  should have known that each was a fiduciary and that Local 38 was also a party in interest

25  to the ERISA Plans.  Sec. Mot. at 10-11.  Also by virtue of their positions as advisors to the

26  trustee of the Convalescent Fund and Sullivan's position as administrator of the

27  Convalescent Fund, Sullivan and Mazzola Sr. oversaw the financial affairs of the

28  Convalescent Fund.  Sec. Mot. at 4-5, 12.  Thus, Mazzola Sr., Sullivan, and Local 38 knew

or should have known that Local 38 was a party in interest to the ERISA Plans, that repayment of Local 38's loan could not occur without transfers from the ERISA Plans to the Convalescent Trust, and that therefore Local 38 was benefiting from the transfers at the expense of the ERISA Plans.  See Reich v. Compton, 57 F.3d 270, 273 (3d Cir. 1995) (allowing 406(a)(1)(D) claim where repayment of ERISA Plan's loan to non-profit company closely related to union, which was a fiduciary and party in interest, at less than accounting value benefited union because union took responsibility for paying financial obligations of non-profit); Nat'l Bank of Alaska, 828 F. Supp. at 1434.  Based on the foregoing facts, Defendants fail to show that there is no genuine issue of material fact regarding the Secretary's Fourth Claim for relief, and Defendants' motion for summary judgment on this claim must be denied.

## IV. CONCLUSION

For all the reasons stated above, the Secretary asks this Court not only to deny Defendants' motion but to enter judgment in her favor on her Fourth Claim, and order that none of her claims are barred by the statute of limitations, res judicata, waiver or unclean hands.

FEBRUARY 14, 2007

JONATHAN L. SNARE  
Solicitor of Labor

TIMOTHY D. HAUSER  
Associate Solicitor  
Plan Benefits Security Division

THERESA S. GEE  
Deputy Associate Solicitor

RISA D. SANDLER  
Counsel for Fiduciary Litigation

By:_____/s Megan Guenther_____  
          Attorney signing

WAYNE BERRY  
PETER DOLAN  
W. IRIS BARBER  
MEGAN GUENTHER  
JAMES M. CALLOWAY  
KRISTEN LINDBERG

Attorneys for Plaintiff  
ELAINE L. CHAO, Secretary of Labor,  
U.S. DEPARTMENT OF LABOR

1

CERTIFICATE OF SERVICE

2 I hereby certify that on February 14, 2007, a copy of the Secretary's Opposition to

3 Defendants' Motion for Summary Judgment was filed electronically.  Pursuant to General

4 Order No. 45, Section IX.A, notice of this filing will be sent to all parties by operation of

5 the Court's electronic filing system.  Parties may access this filing through the Court's

6 system.

7

8

9                                              ___/s Wayne R. Berry_____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28